1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------X
In Re the Matter of:                        :   21-08146  (REG)
                                            :
     LONG ISLAND MINIMALLY INVASIVE  :   Brooklyn, NY
     SURGERY, P.C. d/b/a,             :   October 11, 2022
                                            :
                         Plaintiff,   :
              -against-                :
                                            :
     LISA ORSLINI,                     :
                                            :
                         Defendant.    :
------------------------------------------X

[2] Trial on ADJ Summons and Notice of Pre-Trial Conference
            BEFORE THE HONORABLE ROBERT E. GROSSMAN
                 UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Plaintiff:        SAHN, WARD, BRAFF, KOBLENZ
                          BY:  DANIELÉ DE VOE
                          1325 Franklin Avenue, Suite 210
                          Garden City, NY 11530

For the Defendant:        BERGER, FISCHOFF, SHUMER
                          BY:  HEATH S. BERGER
                          6901 Jericho Tpke., Suite 230
                          Syosset,  NY 11791

APPEARANCES               LISA ORSLINI
CONTINUED:                JACQUELINE SPINA
                          Witness for Plaintiff


Court Transcriber:        ADL Transcription Services, Inc.
                          24 Crossway Drive
                          Deer Park, New York 11729
                          (631) 277-7900




Proceedings recorded by electronic sound recording,

transcript produced by transcription service.

INDEX

WITNESSES                                                    PAGE

          JACQUELINE SPINA

Direct Examination by Mrs. De Voe                        11

Cross Examination by Mr. Berger                          34

Redirect Examination by Ms. De Voe                      61


          EXHIBITS

PLAINTIFF'S            DESCRIPTION              MARKED

REC'D

1    8-21-14 Assignment of Benefits              23

2    8-21-14 Out of Network Insurance            26

          Payment Agreement

3    Invoices Covering 8-22-14 - 12-19-18        32

P R O C E E D I N G S

THE CLERK:  Trial on Long Island Minimally Invasive Surgery versus Orslini, case number 21-8146.  Please state your appearance.

MS. DE VOE:  Good morning, Your Honor.  Danielé De Voe, Sahn, Ward, Braff, Koblenz, PLLC, 1325 Franklin Avenue, suite 210, Garden City, New York, for the plaintiff creditor.  With me is Jacqueline Spina.

THE COURT:  Good morning.

MR. BERGER:  Good morning, Your Honor.  Heath Berger, Berger, Fischoff and Shumer, attorneys for the debtor defendant Lisa Orslini.  With me, Your Honor is the debtor defendant Lisa Orslini.

THE COURT:  Good morning.

MS. ORSLINI:  Good morning, Your Honor.

THE COURT:  Okay.  Let's go.

MS. DE VOE:  Your Honor, I just have a few housekeeping matters I would like to discuss with the Court. Plaintiff would like to make a motion in limine that the defendant be precluded from disputing that she received and cashed the insurance checks at issue here.

This is for two reasons.  One, based upon her willful failure to comply with discovery in this case, so preclusion.  Also premised upon collateral estoppel based upon a lower Court judgment entered against her.

Unlike Federal Court precedent, New York law does give collateral estoppel effect to default judgments rendered against an individual.  Specifically, the Second Circuit said in Evans v. Ottimo that a default judgment rendered under New York law can have inclusive effect in a dischargeability proceeding.  That was also upheld by Ruby Lynn, 576 Bankruptcy 32 Eastern District of New York 2017 and most recently by Judge Nancy Hershey Lord in in re Smallwood 2021 Westlaw 446 550 60.

Based upon the fact that in the underlying proceedings it was alleged that the defendant assigned all rights and interests in the insurance checks over to the doctor and thereafter cashed them knowing that she had no right to retain those checks it is respectfully requested that the defendant be precluded today from offering any evidence to dispute that and that this Court take judicial knowledge of those facts.

THE COURT:  Mr. Berger?

MR. BERGER:  Thank you, Your Honor.  A couple of issues, Your Honor.  First and foremost, Counsel did bring on a motion to strike the answer, the Court denied that.

Second, Your Honor this is a case where I was seeking to discharge medical bills.  There was a default judgment, but if we go through the statutory basis for the three 523 claims that they are seeking to discharge, none of

it was laid out in the default judgment.  I don't think the Court should give collateral estoppel.

But more importantly, Your Honor is that both on the default judgment and in the adversary complaint Counsel makes statements not upon information and belief, but statements that says that the debtor cashed checks.

Now, the amount in dispute, Judge of the checks that are alleged to be cashed is $2,880.  That's it.  They're seeking of course their full amount to the judgment plus interest to be non-dischargeable, but the issue on these alleged checks.  Now, they've asked for us to provide proof of it.

They've never in their State Court action provided proof of those checks, but yet there's affidavits that specifically state that the debtor cashed it and deposited it into their personal account.  In their adversary complaint about thirteen paragraphs is talking about how she cashed it for her personal use, how she deposited it, yet at no point, Your Honor has anybody seen these checks.  I mean they're actually --

THE COURT:  Well, is the debtor gonna testify?

MR. BERGER:  She will testify, yes.

THE COURT:  So ask her.

MS. DE VOE:  Your Honor, specifically it's alleged in the underlying matter that she stole these insurance

checks.  Under the precedent in re Smallwood, Evans v. Ottimo, Miller versus Falco, she is precluded from disputing the fact that she stole these insurance checks and that's what the interim motion is for.

THE COURT:  Counsel, she's gonna be on the stand, you'll ask her did you get checks, did you cash them.

MS. DE VOE:  However, under the precedent that's --

THE COURT:  Listen to me, listen to me.  I did Ottimo, I know.  Some of those decisions are mine.  I understand how it works.

MS. DE VOE:  I realize that they're your decisions, Your Honor.

THE COURT:  But let's just try to be somewhat logical about how this all goes on.  This defendant, this plaintiff rather -- defendant is gonna take the stand.  Mr. Berger is not gonna let her perjure herself.  She's gonna testify honestly and it would be up to the Court to decide.

But the checks represent $2,800 give or take. There's a $60,000 give or take claim here.  They're not disputing -- and I assume that there was a judgment entered in the State Court for $54,000 and change.

There is no dispute in front of this Court and it's based on collateral estoppel and other issues that the State Court found that the defendant owes your client $54,000. That is not a finding of 523, it just proves I think to this

Court you're a creditor and she owes you the money.

The issue in front of us is whether that is dischargeable or not dischargeable.  Very few State Court judgments and decisions, and we've had these conversations with State Court Judges and lawyers, that State Court lawyers and State Court Judges are loathed to put in their decisions the elements necessary to establish a 523.  On the default I read through whatever exists.  You have to prove the 523 case.

I think the issue of whether the $54,000 is owed and whether it's in limine about the $2,800 they hand you $2,800 today and walk away I'm sure.  So they don't care about the $2,800.  The issue is is it dischargeable.

MS. DE VOE:  Correct, Your Honor, but she's disputing in her answer in this adversary proceeding that she even stole the $2,800 and binding precedent upon this Court dictates --

THE COURT:  I'm done with this.  You'll ask her. She'll say I -- whatever she says she owes $54,000, okay? If she wants to - if the defendant wishes to take a position that I never got the checks and I never cashed them she'll testify to that and if we find out that that's not true what is a small problem becomes an enormous problem, but that's - they're aware of that.

MS. DE VOE:  Here's the issue though, Your Honor.

You've tied my hands.  I served discovery demands on Mr. Berger, he just didn't respond at all.

THE COURT:  Are we still talking about the checks?

MS. DE VOE:  Well, I'm just stating that I subpoenaed them from the insurance company and now I found binding precedent that I don't need to produce the checks because she's estopped from disputing that she had the checks.

THE COURT:  Why do you care about the checks if I've already established she owes you $54,000?

MS. DE VOE:  Because it shows --

THE COURT:  Why do you care?

MS. DE VOE:  Her intent to fraud, Your Honor because she embezzled money that was intended to pay --

THE COURT:  Even if she cashed the checks and took them and embezzled them from the insurance company if you wanna prove she embezzled them from you I got it, but that's not in any of the documents in front of me, that's an element of proof.  You're gonna have to go down that path and if you wanna use the checks and she denies she ever got them that'll be her testimony.

So look, it is not worth the time to discuss $24,000 - $2,400 or $2,800 when you're suing for sixty and I've already agreed with you she owes you the money.

MS. DE VOE:  And in all due candor, we attempted to

settle this case for the amount still owed plus attorney's fees.

THE COURT:  I don't wanna know about settlements.

MS. DE VOE:  I also wanna bring your Court's decision in regard to your attention with regard to in re Gerard, adversary proceeding number 19-08085, where Your Honor found with regard to this exact same plaintiff that the debt was not dischargeable under these exact same circumstances under 523 (A)(6) so I would just like the Court to take judicial notice of your specific precedent holding that this debt is not dischargeable.

THE COURT:  Yeah, I don't remember much, but I normally can read the cases I wrote and figure them out. Look, today's -- let's just be smart.  Today's trial is not about whether she owes the money.  They can argue that, but it's not about whether she owes the money, it's about whether this debtor is entitled to a discharge which normally debtors get unless there's an exception under 523. You have a 2A, 4A, 6, whatever your counts are and that's your burden to prove it.  So we have an evidentiary record, you'll either call the defendant or they will, the defendant will be on the stand, they will - they have a series of arguments, mainly they'll lay out a series of defenses and then I'll make a decision.

But let's not make this into more than it is.  I

don't -- the $2,400 how that was incurred is irrelevant not as to whether you wanna prove fraud, it's an element of that if you wanna - to your proof.  But as to the amount it's irrelevant.  It's already been found she owes it by the State Court.  You don't have to convince me.  She owes you $54,000.  The issue is is it dischargeable.  That's what you guys have been fighting about.  If it's dischargeable she didn't care I assume (inaudible).  So let's get to the main event.

MS. DE VOE:  Your Honor, can we move over these partitions?

THE COURT:  I would love to except you'll get arrested if you try and they don't move and I actually can -- if one of them does be my guest, but I've been told that these things were all installed, I can't get rid of this.  They actually tried to put on top of my chair, but Mr. Berger was --

MR. BERGER:  (Inaudible).

THE COURT:  Many of our local lawyers have argued that anyway, but yeah, be my guest.

MS. DE VOE:  It's just I don't fit under the chair with it there.  Your Honor, the --

THE COURT:  You have a doctor there anyway so we're okay.  All right.  You guys wanna make any opening statements or go right to the case?

MS. DE VOE:  Opening statements can be waived.

MR. BERGER:  I'll waive an opening.

THE COURT:  Okay.  Let's go.

MS. DE VOE:  Your Honor, I call - the plaintiff calls Jacqueline Spina to the stand.  Jacqueline Spina.  She wants to know if she can testify from her chair or if you'd like her to go to the witness stand.

THE COURT:  You get the featured seat.

THE CLERK:  Please raise your right hand.  Do you swear or affirm to tell the truth, the whole truth and nothing but the truth so help you God?

J A C Q U E L I N E   S P I N A, a witness herein, was examined and testified as follows:

MS. SPINA:  Yes, I do.

THE CLERK:  Please be seated.  State and spell your name for the record.

MS. SPINA:  Jacqueline Spina, J-a-c-q-u-e-l-i-n-e, S as in Sam, p-i-n-a.

DIRECT EXAMINATION

BY MS. DE VOE:

Q.   Good morning, Ms. Spina.  Where do you work?

A.   Long Island Minimally Invasive Surgery doing business as New York Bariatric Group.

Q.   How long have you worked for the New York Bariatric Group?

A.    I've worked for the company for fourteen years, then I was - I retired for one year, then I couldn't stay away and I went back and I'm there now since June of 2021 - 2022.

Q.    When did you first start working for New York Bariatric Group?

A.    October of 2007.

Q.    What was your title when you first started working for New York Bariatric --

A.    Billing manager.

Q.    Can you please let me finish my question?  What was your title when you first started working for New York Bariatric Group?

A.    Billing manager.

Q.    What were your job duties as billing manager?

A.    I managed the process with the staff, the billing staff of everything that happens from the time the patient comes in at the front desk with any questions on the paperwork they sign to the correct coding of billing what they did for the day, all the way through to getting the insurance to make the payment, then the collection of the payment either from the insurance company or the patient till it's complete - each line of service was completely resolved.

Q.    What is your current title at New York Bariatric

Group?

A.   Now I'm the manager of patient relations.

Q.   What are your job duties as manager of patient relations?

A.   Pretty much the same thing, a few lesser things because I'm actually sixty-nine, whether you can believe that or not, and - but I'm basically still doing very similar things with the company.

Q.   Who is the head of New York Bariatric Group?

A.   Shawn - Dr. Shawn Garber.

Q.   How long has Dr. Garber been practicing medicine?

A.   Thirty years he's been in practice.

Q.   Do you know if Dr. Garber participates as an in network provider for Empire Blue Cross Blue Shield?

A.   He has never been in network with any insurance.

Q.   Can you please explain to the Court what the difference is between an in network provider and an out of network provider?

A.   Yes.  In network providers are normally doctors that have just come out of medical school.  They become in network providers so that they can grow their business.  The out of network providers are normally the more seasoned doctors who don't wanna be in network as they get paid pennies on the dollar.

Q.   How does it work with the insurance company

remitting payment for an in network provider?

A.    Excuse me?

Q.    How does it work with regard to receiving payments when you're an in network provider?

A.    Okay.  So if you're an in network provider you're contracted with the insurance company and you agree to accept the amount that is allowable for that particular service minus any deductible or co-insurance.

Q.    Who is that check issued to?

A.    The check then would be issued to the provider directly.

Q.    How is an out of network provider different?

A.    Out of network is different because we are not contracted.  There are different rates for the provider at that point, but normally they're much higher based on a better fee schedule.  The checks then are sent to the patient.  We have the patient sign responsibility to turn over those checks to the provider as payment.

Q.    Why are the checks sent to the patient when there's an out of network provider involved?

A.    Why are they sent?

Q.    Correct.

A.    Because we're not contracted with the insurance company.

Q.    Are you aware of what an insurance contract where

the patient states with regard to their responsibility when they hire an out of network provider?

A.    Yes, I am.

Q.    Can you please tell the Court what that is?

A.    The responsibility is to receive those checks, bring them in, they sign a document that they say they're turning over all their interests and rights to those checks to the provider.

Q.    I'm not talking about the relationship between the patient and you, I'm talking about the patient's obligations to the insurance company.

A.    The patient's obligation to the insurance company?

Q.    Correct.  So when a patient -- I'll rephrase. When a patient hires an out of network provider are you aware of what the relationship between a patient and the insurance company is regarding payment to that provider?

A.    Yes, but I'm not sure how to explain it.  So the -- we the provider bill the insurance company, the insurance company sends the payment to the patient directly.

Q.    Why do they send the payment to the patient directly?

A.    Because the patient normally has to pay upfront to the doctor and they reimburse the amount that's allowable through their contract to the patient.

Q.    So when someone sees an out of network provider

they pay the doctor directly and then get reimbursed from their insurance company, is that correct?

A.    Yes.   They normally pay the full amount upfront and then they get reimbursed by their insurance company according to what the allowable amount from their insurance company for an out of network provider is.

Q.    Is there any money deducted from an insurance check that's issued to a provider either in network or out of network?

A.    If they excuse me?

Q.    Is there ever any money deducted from an insurance check issued by an insurance company with regards to whether they're in network or out of network?

A.    Yes, the deductible is applied first and then a co-insurance depending on what the person's policy is. Usually if it's a better policy there's less out of pocket for the patient meaning less deductible, less out of co-insurance.   If it's a not as good policy there may be more deductible and more co-insurance.

Q.    Do you know what a deductible is?

A.    Yes, deductible is the amount that has to be paid from the patient's pocket before any payment is issued by the insurance company.   So for example, if they have a $10,000 deductible they have to pay the first $10,000 of the allowable amount, it comes out of their pocket, after which

the insurance company starts to make payment depending then of course if they have co-insurance also.

Q.    What is co-insurance?

A.    Co-insurance means that the insurance company will pay for example eighty percent and the patient will be responsible for twenty percent up until they reach what is called an out of pocket max.  Once they've paid x amount out of pocket then the insurance company will pay one hundred percent.

Q.    When you receive a patient at the practice who explains to them whether the doctor they're seeing is in network or out of network?

A.    We make it very clear both verbally and with written documents.  We explain the doctor is out of network. Those patients, and only those patients, are given particular documents that they have to sign stating that they understand that it's an out of network provider, stating that they will turn over the checks as received within seven days of receipt.

Q.    When does this conversation occur?

A.    The first day that they come in at the front desk. And if there are any questions I would be called to come out and explain that to the patient.

Q.    You mentioned that the patient signs a document stating that they understand they're seeing an out of

network provider.  Do those documents have a name?

A.   Yes, it's called Assignment of Benefit and Out of Network Payment Agreement.

Q.   Are those documents given to every patient or just certain patients?

A.   No, only to patients that have out of network benefits.  If they're in network we do not give those statements to them to sign.

Q.   Are you familiar with a patient named Lisa Orslini?

A.   Yes, I am.

Q.   How are you familiar with Ms. Orslini?

A.   Well, I remember the name from when she first came in because her name is Lisa and that's my daughter's name and I was brand new there and I remember saying oh, another Lisa and the name just stood out to me and I remembered her name forever and then she was a patient for a long time, then she was, you know, pretty much finished with the practice and then she came back.

Q.   Do you recall what initial services Ms. Orslini received?

A.   I'm sorry, what?

Q.   Do you recall what services Ms. Orslini initially received from the practice?

A.   Yes, initially I believe she had a laparoscopic

bypass.  Is that correct?  Yes.

Q.   Do you recall whether she had any other procedures with the practice?

A.   Yes, she returned a few years later and then I believe she had a lap band placement, laparoscopic lap band placement after which you come in for fills or for them to adjust the band.

Q.   Is it typical for someone who has a laparoscopic bypass to return to the practice for other procedures?

A.   Yes, it is because after a few years in most cases the patients then start to gain the weight back and they wanna get it under control so they do a different procedure.

Q.   With regard to the gastric band procedure can you describe for the Court what that entails?

A.   So a band is put around your stomach kind of like a rubber band, but the inside part, excuse me, is inflatable and then when you come in for an adjustment, I'm sorry, they add fluid or take out --

THE COURT:  Do you need some water?

MS. SPINA:  Yes, I do.  Oh, I see.  Thank you.

A.   So when you come in for an adjustment they either inject fluid into the inside of the band hence making it tighter and, therefore, limiting what you can eat and if you're unable to eat enough they will take out fluid so that it opens it up and, therefore, you can eat a little bit

more.

Q.    When Ms. Orslini first came to the practice in or about 2006 for the gastric bypass procedure did you ever have any issues with her turning over the insurance checks received?

A.    No, she was with the practice for years and years and every check that she received she brought in.  There were absolutely no problems.

Q.    With regard to co-insurance, co-payment and deductible did you ever have an issue with Ms. Orslini turning over those portions in early days that she was with the practice?

A.    No, we never had a problem with her.

Q.    When did you start having issues with Ms. Orslini turning over the insurance checks?

A.    When she came back to the practice.  The first few visits she did bring the checks accordingly.  As time went on she brought in some of the checks and some of them she did not.  We did approach her about it because she was not one of those patients that did not turn over the checks, she was a patient who did bring in the checks and she brought in prior to that situation, during that situation and after that situation.  So she clearly knew to bring in the checks, that was not a problem, but there were missing checks that she just didn't bring in.

Q.   When you spoke with Ms. Orslini about the missing checks what if anything did she respond?

A.   When we spoke to her excuse me?

Q.   About the missing checks.

A.   Yes.  She was stating that she didn't receive them, but she did receive the checks.

Q.   How do you know that she --

MR. BERGER:  Objection, hearsay, Your Honor.

Q.   How do you know --

MR. BERGER:  Hearsay.

THE COURT:  Hold it.

MR. BERGER:  Objection, hearsay.

MS. DE VOE:  She already answered the question. She's stating -- it's a party opponent admission, that means it's a statement against interest.

THE COURT:  Overruled.

Q.   Ms. Spina, --

MS. DE VOE:  I lost my train of thought.  Where was I going?

Q.   How did you know Ms. Orslini got the insurance checks?

A.   Because the insurance company informed us when we checked into it that the checks were sent to the patient and there had never been a problem with the patient ever receiving them before so why -- and during that timespan out

of a few checks she did bring in some, there were just a few that she just didn't bring in.  From my experience it almost looked like she brought in some maybe thinking that we just wouldn't figure out that there were a few missing.

Q.    Did you continue to treat Ms. Orslini after you discovered she had kept the first check?

A.    Yes, we continued to treat her because we had never had a problem with Ms. Orslini.  So other patients perhaps from day one they're not bringing the checks, then it's clear.  With Ms. Orslini there was never a problem.

Q.    How did you contact Ms. Orslini about the insurance checks?

A.    I believe we sent statements on a regular basis. I believe that she received phone calls also in regards to the checks.

Q.    Ms. Spina, I'd like to direct your attention to what has been marked for identification as Plaintiff's Exhibit 1.  Can you please open your binder to number 1?

A.    Yes, I do.

Q.    Can you please tell the Court what this document is?

A.    This is the Assignment of Benefits in Light of Recovery that Ms. Orslini signed on 8-21-2014 which is when she returned to the practice.

Q.    You're referencing a date.  Where on this document

is it dated?

A.    On the bottom right of the statement, of the document.

Q.    Is this document in the same or substantially the same condition today as it was on the date it was executed?

A.    Yes, it is.

Q.    Is it in the regular and ordinary course of New York Bariatric Group's business to create a document such as this?

A.    Yes.

Q.    Is it in the regular and ordinary course of New York Bariatric Group's practice to retain a document such as this?

A.    Yes, absolutely.

MS. DE VOE:  Your Honor, at this time I'd like to have what has been marked for identification as Plaintiff's Exhibit 1 admitted into evidence as Plaintiff's Exhibit 1.

MR. BERGER:  No objection, Your Honor.

THE COURT:  Without objection.

Q.    Ms. Spina, can you please advise the Court what the sum and substance of this document is?

A.    This is the document that we give the patient to sign stating that they understand that they are signing overt he rights and interests of any checks received to Dr. Garber.

Q.    Is there any other provisions in this document as to what happens in the event she fails to turn over a check?

A.    Yes, it actually states that if -- let me see where it is.  It actually states that I hereby authorize the insurance company as listed above to the medical practice -- let me see.  I will pay the medical provider practice for all charges incurred and if I don't for all charges the sums actually paid will be - they will be held responsible for.

Q.    And if she doesn't turn over the money is she responsible for any other costs or charges?

A.    Yes, then she -- until the checks are turned over she'd be responsible for total charges.

Q.    Is there a provision in this agreement that states she's responsible to pay Court costs and fees in the event she doesn't honor her obligations under the agreement?

A.    Yes, there is.  It says that she would be responsible for total charges if the checks are not turned over.

Q.    Does it also state she'd be responsible for costs and fees?

A.    Yes.

Q.    Where is that?

A.    In the second paragraph.  I agree to pay all charges which remain unpaid by the insurance company or welfare benefit plan regardless of the outcome of my appeal.

Q.   Would you provide this document to someone who wasn't seeing an in network provider?

A.   No, absolutely not, there'd be no need to.

Q.   And Dr. Garber has indicated - it's indicated on the document as the provider.  Was he --

A.   Yes, he was.

Q.   Was he in network for Blue Cross Blue Shield at this time?

A.   No, he was not.

Q.   Ms. Spina, directing your attention to what has been previously marked for identification as Plaintiff's Exhibit 2.  Can you please take a look at the document and tell the Court if you recognize it?

A.   Are you saying document 2?

Q.   Yes, ma'am.

A.   Yes.

Q.   Please tell the Court what it is.

A.   This is an Out of Network Insurance Payment Agreement.

Q.   Is this document dated?

A.   Yes.  It's a two page agreement, it's dated on the next page, on the second page August 21st, 2014.

Q.   Is this document in the same or substantially the same condition today that it was on the date it was created?

A.   Yes, it is.

Q.   Is it the regular and ordinary course of New York Bariatric Group's business to create a document such as this?

A.   Absolutely.

Q.   Is it in the regular and ordinary course of New York Bariatric Group's business to maintain a document such as this?

A.   Yes.

MS. DE VOE:  Your Honor, at this time the plaintiff would like to move to have admitted into evidence what was previously marked for identification as Plaintiff's Exhibit 2.

MR. BERGER:  No objection, Your Honor.

THE COURT:  Without objection.

Q.   Ms. Spina, can you please tell the Court what the sum and substance of this document is?

A.   This is a document that only patients with out of network insurance would sign.  This states that the payments from your insurance company will come directly from you - from - will come directly to you, excuse me.  All payments must be endorsed and forwarded to our office within seven days of receipt.

If you fail to forward any checks your receive from the insurance company or your deductible due within the seven day period you will be held responsible for the full

amount charged for your surgery plus the cost of legal fees, legal costs and disbursements with no courtesy discount granted.

Q.   Is this document signed by Ms. Orslini?

A.   Yes, it is.

Q.   Where do you see Ms. Orslini's signature?

A.   On the second page in the middle.

Q.   How many times did Ms. Orslini sign this --

A.   It is signed twice.

Q.   Please let me finish my question.  Why did Ms. Orslini sign this document twice?

A.   Because she is both the policyholder as well as the patient.

Q.   If the patient is not seeing an out of network provider would they execute this agreement?

A.   There would be no need to, absolutely not.

Q.   If a patient refuses to sign Plaintiff's Exhibit 1 or Plaintiff's Exhibit 2 what is the Bariatric Group's policy with regard to payment?

A.   They would have to pay the total amount upfront if they don't sign these documents.

Q.   Why is that?

A.   Because these documents give us proof that the patient will receive the check and turn it over, otherwise we don't know that they're ever gonna pay, we wouldn't do

the surgery.  The same as a self-pay until the patient pays the total amount upfront.  If they sign the documents we are willing to wait for the payment until the insurance company sends it to them.

Q.  Would we be sitting in Judge Grossman's Courtroom today if she didn't sign these documents?

MR. BERGER:  Objection, Your Honor.

THE COURT:  Sustained.

Q.  Ms. Spina, I'd like --

THE COURT:  Can I -- let me ask you something.  Do you care if you get the insurance company's checks or do you just wanna get paid?

MS. SPINA:  They can either bring us the check or pay out of pocket if they cash it, as long as it's the amount of the check.

THE COURT:  So if somebody had paid you for this she could have kept the checks, you don't care?

MS. SPINA:  Absolutely.

THE COURT:  Okay.

Q.  Ms. Spina, I'm directing your attention -- I'm sorry, strike that.  Ms. Spina, did there come a time where you referred Ms. Orslini for litigation?

A.  Yes.

Q.  Do you recall when that was?

A.  I believe it was in 2016.

Q.    How much do you recall was outstanding at the time you referred the matter for litigation?

A.    I believe it was only $2,800, $2,400, I'm sorry, I don't remember.

Q.    Ms. Spina, I don't want you to guess.  If you don't recall I can direct your attention to the invoices in this case, but --

A.    Okay.

Q.    Neither one of those numbers are correct so please don't guess the answer.

MR. BERGER:  Objection, testifying for the witness, Your Honor.

Q.    Ms. Spina, I'm directing your attention to what's been marked for identification as Plaintiff's Exhibit 3. Can you please take a look at it?

A.    Yes.

THE COURT:  3?

MS. DE VOE:  3.

A.    So there are a few invoices here.

Q.    Can you just take a moment to look and I'll ask the next question?  If you need to add up the amount of the invoices that's fine as well.  I'm just trying to refresh your recollection as to the amount that was outstanding at the time the matter was placed for litigation.

A.    $16,000, is that the total on the one?  I'm so

sorry.

Q.    Would you like a calculator, Ms. Spina?

A.    $16,000.

Q.    Would you like a calculator --

A.    Oh.

Q.    So you could add up the invoices?

A.    You want me to add them up?

Q.    Yes, that's what I asked you to do.

A.    Okay.  $17,175.  I'm sorry if it's not coming up correctly.

Q.    It's okay, I know you're nervous.

A.    It's saying invalid format.

Q.    Do you need me to clear the calculator?

A.    Thirty-six -- I'm sorry.  $36,975.69.

Q.    Ms. Spina, the document that you're looking at is it dated?

A.    I'm sorry, I don't hear you.

Q.    The document that you're looking at marked as Exhibit 3 is it dated?

A.    Yes, they are.

Q.    What is the date on the document?

A.    The date on the document is on the left hand side of the document in the middle.

Q.    What is the date of the document?

A.    There are a few.

Q.    What is the date that this invoice was sent to Ms. Orslini?

A.    The date of each invoice?

Q.    The date of the invoice, yes.

A.    Yes.

Q.    Not the date of the services rendered, the date of the invoice.

A.    Okay.  The date of the invoice is to December 19th, 2018.

Q.    You stated there was two.

A.    It is from 8-22-2014 to 12-19 of 2018.

Q.    Are you aware of what date this invoice was sent to Ms. Orslini?

A.    Yes.

Q.    What date was that?

A.    12-19-18.

Q.    Can you tell the Court for the record where you're reading this from the document?

A.    On the upper right hand side of the statement.

Q.    Under the words statement period to?

A.    Statement period from to.

Q.    Are these documents in the same or substantially the same condition today as they were on the day you sent them to Ms. Orslini?

A.    Yes, they are.

Q.    Is it in the regular and ordinary course of New York Bariatric Group's business to create a document such as this?

A.    Yes, it is.

Q.    Is it in the regular and ordinary course of New York Bariatric Group's business to maintain a document such as this?

A.    Absolutely.

MS. DE VOE:  Your Honor, at this time we'd like to move to have admitted into evidence what has been marked for identification as Plaintiff's Exhibit 3.

MR. BERGER:  No objection, Your Honor.

THE COURT:  Without objection.

Q.    Ms. Spina, did Ms. Orslini ever pay the $36,000 that is outstanding as reflected in these invoices?

A.    No, she did not.

Q.    Did she ever turn over any additional insurance checks after she was referred for litigation?

A.    No, she did not.

Q.    Does the $36,000 and change set forth in these invoices remain outstanding today?

A.    Yes, it's still outstanding.

Q.    I'm directing your attention to what's been marked for identification as Plaintiff's Exhibit 4.  Do you recognize this document?

Case 8-21-08146-reg    Doc 20    Filed 10/24/22    Entered 10/24/22 03:53:57

A.    Yes.

Q.    Can you please tell the Court what it is?

A.    This is the judgment that was entered against her.

Q.    Can you advise the Court the amount of the judgment?

A.    $54,128.60.

Q.    Are you aware of why this judgment is for about $20,000 more than the amount outstanding?

A.    Yes, because when you don't hand in the actual checks or the amount received you are responsible for total charges plus attorney fees.

MS. DE VOE:  Your Honor, at this time we'd like the Court to take judicial notice that this transcript of judgment is a public record that I personally obtained off the New York State electronic case filing system and it's a true and accurate record of the transcript of judgment that was filed in this case.

MR. BERGER:  Judge, as the Court stated, excuse me, previously we agree they're a creditor in the case so we don't object.

THE COURT:  Without objection.

MS. DE VOE:  Thank you, Your Honor.

MR. BERGER:  Excuse me.

Q.    Does the amount set forth in this judgment remain outstanding today?

A.    Yes, it's still outstanding.

Q.    Thank you, Ms. Spina.

MS. DE VOE:  No further questions.

CROSS EXAMINATION

BY MR. BERGER:

Q.    Ms. Spina, I'm a little confused and sometimes I guess insurance confuses me all the time.  So is it your testimony that Ms. Orslini did not have network insurance when she sought the services of your client?

A.    She did not have in network insurance.

Q.    Okay.  If I don't have in network insurance and I go to the doctor do I have to pay a co-pay or that's only if I have in network services?

A.    So if the doctor is in the network with your insurance you would pay a co-pay which is different.  So we don't accept co-pays from patients that are seeing an out of network provider.

Q.    So is it your testimony that you've never accepted a co-payment from Ms. Orslini?

A.    We never take co-pays, we take co-insurance.

Q.    So is the co-insurance different than a co-pay?

A.    Yes, absolutely.

Q.    And how is that determined?

A.    Because if you're an in network provider you simply pay a co-pay when you come in.  We don't accept a

co-pay because we are not in network at that time with Ms. Orslini, Dr. Garber was not in network.  Co-insurance is something different.  That's usually -- it could be with an in network provider as well as an out of network provider, but you wouldn't ask for that money upfront, that would be after the payment.

Q.   Okay.  So it wouldn't be asked so if I come in for a follow up of my procedure you wouldn't ask me for that upfront, correct?

A.   We wouldn't ask for your co-insurance because we wouldn't know how much to charge you.

Q.   The only thing you would ask for if I was in network would be my co-pay, correct?

A.   If you were seeing an in network provider we would ask for a co-pay.

Q.   And would it be (inaudible) kind of co-pays to give a $20 co-pay, a $30 co-pay, kinda depending on the insurance?

A.   Yes, it all depends.

Q.   Okay.  I've got a couple of other questions for you.  How much was Ms. Orslini billed for this entire procedure from I guess it was 2014 through till I guess you said December of 2019?

A.   Do you mean how much we billed or how much we collected?

Q.   Let's start with how much you billed first.

A.   Really there are so many dates of service I don't have the amount that we billed.  I'm sure it was quite high.

Q.   Okay.  And how much did you receive?

A.   I don't know the - I don't know the total amount we received, but we received everything we were supposed to up until this point.

Q.   Okay.  So you received everything but $2,800, is that your statement?

A.   That is correct.

Q.   And if Ms. Orslini were to have paid you the $2,800 you don't really care about the checks that were received, correct?

A.   Correct, it doesn't have to be the actual check, just the actual amount.

Q.   Okay.  So the checks are irrelevant, it's the payment that you care about, correct?

A.   Yes, that is correct.

Q.   So it's the contract that you entered into for payment, that's what you really care about, correct?

A.   Yes.

Q.   Okay.  So when people come in that are out of network do you sit down with them and go through how much this procedure is gonna cost, how much they could be liable for?

A.    We do not because we don't know at that point how much their insurance is going to pay.  We are actually only asking for the amount the insurance paid to the patient along with any co-insurance or deductible that was applied.

Q.    But do you sit down with them and go through and say you have let's say a $15,000 out of pocket deductible, are you gonna be able to make these payments?

A.    If they ask me to review anything like that I always did.

Q.    But it's not standard practice to review the cost or what their liability could be, is that correct?

MS. DE VOE:  Objection, objection, relevance.

THE COURT:  What's the objection?

MS. DE VOE:  Relevance.

THE COURT:  Overruled.  Go ahead.

MR. BERGER:  You want me to --

Q.    So it's not your policy to sit and go through with anybody on how much their ultimate liability would be based upon their deductible or out of pocket, correct?

A.    That is correct.

Q.    Okay.  So you indicated at some point that there's this $2,800 in checks that weren't received, is that correct?

A.    Yes, that is correct.

Q.    How do you know those checks weren't received?

A.    Because we were never paid for those dates of - some of the dates of service and some of the parts of it we were paid for, she did bring in the checks.  The other ones just remain outstanding.

Q.    When you say she brought in the checks do you have copies of those checks?

A.    I don't have personally the copies, no.

Q.    Where are those checks maintained?

A.    Well, this was from 2014 so I think that they were filed away, but after seven years we don't have them or I don't have access to them is what I should say.

Q.    Is it possible just in theory that those checks weren't given by Ms. Orslini, but came directly from the insurance company?

MS. DE VOE:  Objection.

A.    They would never come --

MS. DE VOE:  Calls for speculation.

MR. BERGER:  She's in the profession, Your Honor, she knows.

MS. DE VOE:  It calls for speculation.  We're talking for her to hypothetically speak about something --

THE COURT:  No, I --

MS. DE VOE:  That she has no personal knowledge of.

THE COURT:  No, I'll allow it.  Do you ever get

checks from the insurance company directly?

MS. SPINA:  Not if you're an out of network provider, absolutely not.  We wish they'd pay us directly, but they do not.  We would never receive that.

Q.   The checks that are in question, the $2,838.70 could you tell me do you have copies of those checks?

A.   No, I do not.

Q.   Did you ever have copies of those checks?

A.   I believe at one point we may have.

Q.   And what happened to them?

A.   Well, after seven years we -- they're probably filed away someplace.  We did try to get them, we were unable to.

Q.   But you indicated in your exhibit that you didn't send a bill to her until 2018 I believe, is that correct?

MS. DE VOE:  Objection, Your Honor, mischaracterization of the client's testimony.  She testified that that's when the last invoice was sent.

MR. BERGER:  I believe she said that that's when the bill was sent, Your Honor.

THE COURT:  Just ask the question.  What's the question?

Q.   Pursuant to your -- what had been marked as Exhibit 3 there are bills that are outstanding.  When were these bills sent to Ms. Orslini?

A.    The payments - the statements of any outstanding balances go out automatically every month so I would assume she has received numerous ones.  This was the final one.  As you could see it is marked final statement.

Q.    So I have a question for you.  The one bill that you have here if you wanna look at it is it looks like services rendered August 22nd, 2014.

A.    Yes.

Q.    You billed her $4,800, --

A.    Yes.

Q.    Correct?

A.    Yes.

Q.    Was Ms. Orslini still a patient of the practice after that date?

A.    Yes.

Q.    Did she come in -- how many times do you think she came into the office after that time?

A.    I believe she came in a few more times for sure after that.

Q.    And you continued providing services to her?

A.    Yes, we had no reason not to, she had a very good reputation that she always brought in the checks so we would not have denied her services just assuming she is going to continue with that behavior.

Q.    Well, if you knew that there was a check

outstanding would you not have asked her for the payment when she came in whether it's via credit card or via debit card?

A.    I believe - I believe we were asking her for the payment.  As I said, every month automatically a statement was going out.  The front desk is informed of anybody with outstanding balances prior to them coming in every day I printed that out for them and they were to ask.  If the patient didn't have it they would let us know.  They said she doesn't have the check, we allowed her to be seen based on our previous experience with her that we had no reason to be worried.

Q.    So my question is if I just (inaudible) she owes $4,800, correct?

A.    She owed the payment for the $4,800 at that point.

Q.    Okay.  Which she didn't pay, but you --

A.    Correct.

Q.    Continued to do services?  Let's go to the next page where it shows three sleep studies.  Do you see that?

A.    Yes.

Q.    For September, 2004 - September 4th, 2014, September 5th, 2014 and September 6th, 2014, is that correct?

A.    Yes.

Q.    And that's a bill for $15,000, is that correct?

A.    That is correct.

Q.    So pursuant to your testimony Ms. Orslini already owed you $4,800, is that correct?

A.    Yes.

Q.    But you then performed services for another $15,000, is that correct?

A.    Yes, based on her reputation.

Q.    But you didn't ask her for a credit card, you didn't ask for a payment on file, is that correct?

A.    We continued to ask.

Q.    But you still performed the services, correct?

A.    Yes, we did.

Q.    Okay.  Let's go to the next page.  There's a whole litany of services from August, 2015 to November of 2015, is that correct?

A.    Yes.

Q.    And --

THE COURT:  Can you step back for a second?  Something doesn't make sense to me.  When the patient comes in and there's an outstanding balance and you ask for a credit card or some payment and the patient says no the response then is okay?

MS. SPINA:  Well, the way it is is that we're not asking -- we're saying to her do you have the checks that your insurance company sent to you.  Sometimes for whatever

reason the patient might be delayed, one of the checks they didn't realize or they didn't get --

THE COURT:  Hold it.  I only wanna get the one point.  Are you asking for the insurance company checks or are you asking to get paid?

MS. SPINA:  We're asking for either.  You can either give us the check or pay out of your pocket for the amount.

THE COURT:  So when you didn't get the checks and you ask her to pay and she doesn't why do you continue to perform services?

MS. SPINA:  Because based on her reputation for years we had no reason for concern.  For years she brought in checks.

THE COURT:  I'm confused.  They don't ask her for the credit card?  If you don't care whether she pays you --

MS. SPINA:  We do care, we do care.

THE COURT:  Then why didn't you get the credit card?

MS. SPINA:  We do care.  We don't ask for it, we work with the patient until the resolve the issue.  If they're saying I didn't receive the check from the insurance company we continue to say please follow up to a reasonable --

THE COURT:  So when Ms. Orslini was asked for a

credit card --

MS. SPINA:  At some point we would --

THE COURT:  And she said no --

MS. SPINA:  She was not paying then.

THE COURT:  Did anybody say anything to her?

MS. SPINA:  Yes, I believe we did.

THE COURT:  What did you say?

MS. SPINA:  We would say that we can't continue to see you without the payment.

THE COURT:  But you did.

MS. SPINA:  No, we did until a certain point.  This was a reasonable amount of time of patients working on getting the checks from the insurance company which we had no reason to believe she was not doing.

THE COURT:  The heart of this is when you ask her for the credit card and she says no and you say you haven't turned over the checks did you ask for any explanation?

MS. SPINA:  Yes, I believe we did, but the patient would say I'm still trying to work with my insurance company.

THE COURT:  No, I don't mean in general.  Did you ask Ms. Orslini for an explanation?

MS. SPINA:  I personally didn't speak with her at that point.

THE COURT:  Okay.

MS. SPINA:  But she would be asked and if her answer was I still haven't resolved the issue with my insurance company stating she didn't receive them or whatever she was stating --

THE COURT:  You can't know that.

MS. SPINA:  Right.

THE COURT:  Okay.

MS. SPINA:  We would - we based on her reputation would allow her to go through.

Q.   So you don't - you personally have no knowledge of any conversation that was had with Ms. Orslini about her payment, --

A.   I was not --

Q.   Correct?

A.   At the front desk unless they called me to come up and speak to her.

Q.   My question is you personally sitting here testifying today had never had any conversations with Ms. Orslini about the bill, correct?

A.   I don't remember.

Q.   And you continued to provide services to her, correct?

A.   Yes.

Q.   As a matter of fact, if I go to I think it's the third bill there is a substantial amount of services

provided between August 3rd, 2015 and November 9th, 2015 which you billed another $16,351, is that correct?

A.   Yes.

Q.   And again, these are all various visits, it's not just one visit, correct?

A.   Correct.

Q.   And each time she showed up you didn't ask her for a payment, correct?

A.   I believe she was asked for a payment.

Q.   But you had no personal knowledge of that, is that correct?

A.   I personally didn't do that job.

Q.   Correct.  And they continued to provide the services to her no matter what, correct?

A.   Correct, based on her reputation.

Q.   You keep using this word reputation, ma'am.  If somebody has to pay a bill they have an obligation to pay a bill.  You have a contract, is that correct?

A.   We have a contract with the patient.

Q.   And the contract says that if I perform services I expect to get paid, right?

A.   Yes, however, there are --

Q.   Thank you, thank you.  Just answer the question.

MS. DE VOE:  Objection.  Please let her finish her answer.

THE COURT:  You can finish your answer.

MS. DE VOE:  You can finish your answer.

THE COURT:  If you wish you can finish it.

MS. DE VOE:  Jackie, --

MS. SPINA:  Excuse me?

THE COURT:  You were cut off.

MR. BERGER:  I apologize.

THE COURT:  You were cut off in your answer.  If you wish to finish it go ahead.

MS. SPINA:  Okay.

A.   So I was just trying to say that I personally created a document for the front desk and they were supposed to ask whether they physically asked the patient we were not getting the checks.

Q.   I have another question for you.  There's checks that are involved that you're alleging that you never received, correct?

A.   Yes.

Q.   Do you know the dates that those checks were received by Ms. Orslini?

A.   I believe it's in the notes.

Q.   I don't have any notes.  So what notes are they in since I don't see that as an exhibit?  So you tell me when she received it.

A.   I don't have that information in front of me.

Q.   Okay.  And when a check came did you -- do you do any investigation if you didn't get it?  How do you know -- withdraw that question.  How do you know that Ms. Orslini or anybody received a check from the insurance company?

A.   Because the person working that account when those dates of services are still outstanding they contact the insurance company, the insurance company will say check was issued to the patient on this date.

Q.   But you have no personal knowledge of whether or not the individual received that check, is that true?

A.   No, but --

Q.   Thank you.  And do you do any research on to see what happened to that check?

A.   Well, because it's an out of network provider --

Q.   It's a yes or no question.  Do you do any research --

MS. DE VOE:  Objection, Your Honor.

A.   Yes, we do.

MS. DE VOE:  Can you let her answer the question?

THE COURT:  All right.  Calm down.  Let her answer the question.

MR. BERGER:  Sorry, Your Honor.

A.   We do do our research.  We are -- we do as much as we can, but because the provider is not an in network provider a lot of this is not online in which case we have

to ask the patient, we say your insurance company is stating that the check in payment of this was sent to you.  Then it becomes the patient's responsibility to follow up with her insurance company if indeed she did not receive the check.

Q.   But you're still performing services for the patient at that time?

A.   Yes, we were.

Q.   Okay.  So then would you physically know whether an individual received a check and then deposited it into their bank account or whether a check got lost?  Would you be able to differentiate that based upon your internal records?

A.   Correct.

Q.   You can?

A.   I can't substantiate if she deposited the check.

Q.   Okay.

MR. BERGER:  So I'm gonna, Judge --

Q.   I would like to show you what I have --

MR. BERGER:  I apologize that I got --

MS. DE VOE:  I need to look at it first.

MR. BERGER:  Okay, that's fine.

MS. DE VOE:  So you're not gonna take anything until you tell me where you're going.

MR. BERGER:  I'm sorry.  What actually is marked as Exhibit D in our book which is an affidavit of facts for a

judgment of default.

THE COURT:  It's Exhibit D in the defendant's exhibits?

MR. BERGER:  Yes.  May I approach the witness, Your Honor?  I apologize (inaudible).

Q.   Ms. Spina, I'm showing you what's been marked as Defendant's Exhibit D.  It's an affidavit for a default judgment.

A.   Yes.

Q.   Is that -- are you familiar with that document?

A.   Yes, I am.

Q.   And it indicates that you were sworn and deposed under it, correct?

A.   Yes.

Q.   And if I look at the back I see your signature on that, is that correct?

A.   Yes.

Q.   And did you review this document beforehand?

A.   Yes.

Q.   And did you swear to the truth and the voracity of what was put in there?

A.   Yes.

Q.   Okay.  I'm gonna put - direct your attention to paragraph six.

MR. BERGER:  I'm gonna read that out loud for the

Case 8-21-08146-reg    Doc 20    Filed 10/24/22    Entered 10/24/22 03:53:57

Court.

Q.   Despite having knowledge of her responsibility to endorse and forward onto plaintiff the checks received for the medical services rendered by the patient - by the plaintiff the patient cashed the checks issued by her insurance company.  You just testified just before that you don't know what happened to the checks, is that correct?

A.   So in this case we may have checked with the insurance and they tell us the check is cashed.

Q.   And do you know who cashed the check?

A.   No, I don't know who cashed the check.

Q.   So you don't know that she - that Ms. Orslini cashed the check, is that correct?

A.   I would assume Ms. Orslini since --

Q.   You can't assume, we're in a Court of law, you swore under oath.  So you don't know whether Ms. Orslini cashed that check, is that correct?

A.   I guess not, but I would assume she did.

Q.   Please just answer the question.

MS. DE VOE:  Objection, Your Honor.  Let her finish the question please.

THE COURT:  Just finish your answers.

MS. SPINA:  Excuse me?

MS. DE VOE:  Finish your answer.

THE COURT:  You could finish your answers.

MS. SPINA:  Yes.

A.  What I was saying is that the assumption if the check was given to the patient would be that the patient cashed the check, but if the patient did not cash the check we inform her that it's her responsibility to find out what happened to the check if she herself didn't cash it.

Q.  You didn't ask her for the money when she came in to have the services continued, correct?

A.  We were asking for the money, but we were being patient to wait.

Q.  Okay.  So I'm gonna go back to what's been marked as Plaintiff's - as Defendant's Exhibit A which is the adversary complaint in this case.

MR. BERGER:  One second.

Q.  By the way, do you know Ms. Orslini's bank account numbers?

A.  Of course not.

Q.  Would you have any information on those bank account numbers?

A.  Not unless she shared it with us.

Q.  Okay.  So I'm gonna show you what's been marked as Plaintiff's - Defendant's Exhibit A which is a copy of the adversary proceeding in this case.  Are you familiar with this document?  Would it help you that this is the --

A.  Yes.

Q.    The complaint seeking to object to the dischargeability of your debt to Ms. Orslini, is that correct?

A.    Excuse me?

Q.    To help you this is the complaint --

A.    Yes.

Q.    That was filed --

A.    Yes, I understand.

Q.    On behalf of -- okay.  Did you - did you review this complaint with your attorneys?

A.    Yes, I believe we did.

Q.    And did you provide them information on it?

A.    Some of it, yes.

Q.    Okay.  I'm just gonna just put you to -- if you could just turn to page six, paragraph number twenty-seven?

A.    Yes.

Q.    And I'm gonna read the statement again.  The defendant knew when she willfully, intentionally, deliberately and maliciously deposited these checks into her personal checking account.  Do you know if any of these checks were deposited into her personal checking account, yes or no?

A.    We wouldn't personally know.

Q.    Do you -- okay.  Thank you.  Then let's go to the next paragraph.  The defendant knew when she willfully,

intentionally, deliberately and maliciously deposited these checks into her personal checking account.  Again, do you personally know whether any of these checks were deposited into her checking account?

A.   Unless she showed us, however, all along she knew what her responsibility was.

Q.   That wasn't my question to you.  The statement is that she deposited these checks.  Do you have personal knowledge that she did?

A.   Obviously unless she showed us we wouldn't know.

Q.   Okay.  And it continues throughout the complaint these allegations.  Do you have any doctors in your practice that are in network?

MS. DE VOE:  Objection, relevance.

THE COURT:  Overruled.

A.   At that time we did not have any doctors that were in network with the practice with Blue Cross.

Q.   But were they in network with other insurance companies?

A.   Some of them may have been with other insurance companies, but not Dr. Garber.

Q.   Okay.  I just have a couple of real quick questions.  On your -- can you go back to what's been marked as Plaintiff's Exhibit 1?  That's the assignment of insurance benefits.  In that document does it say anywhere

that if she received any checks that they would have to be turned over to you that if she received any checks they would have to be turned over to you in that specific document?

A.    Let me see.  Yes, I'm sure it does.  It says I would pay the medical provider for all charges incurred.  We don't care if it's the check or out of her pocket, but it's the amount.

Q.    Right, to pay for services, okay.  So that's a contract that you had with her, correct?

A.    Um-hmm.

Q.    And the contract was fee for service, correct?  And you would agree if there was a reduction in something then you'd accept that, correct?

A.    It depends what the reduction was because in some cases the patient is held responsible to argue with her insurance.  We do help them.

Q.    Okay.  Thank you.  Okay.  So do you tell that to the patient ahead of time because I asked you when we first started do you go through a payment plan or do you go through a billing with them what it's gonna be or what their insurance is gonna cover and you answered no?  So now you're testifying that well, wait, we don't (inaudible) you get from the insurance, we may charge you extra.  Which is the correct answer?

A.    No, so what you asked --

MS. DE VOE:  Objection to the form of the question.

THE COURT:  Excuse me?

MS. DE VOE:  Objection to the form of the question, that's compound.

THE COURT:  Break it up.

MR. BERGER:  Okay.

Q.    You testified when we first started on my cross examination that you don't sit and go over with the patient what they're liability is gonna be, you know, you don't go through with them what their deductibles are what their out of pocket is, that's correct, right?

A.    What I said to you is what -- your question was when they first come in and I said we only go over it if they ask.  If they ask at the beginning on the first day is what you asked me.  Going forward as the payments are being issued we most certainly explain to the patient what we're looking for, what they have to do, what their responsibly is most definitely.  That's a separate issue.  Then it becomes -- it's definitely a separate issue.  If the first day they're asking questions I would be personally the one to explain.

Q.    But you never explained anything to Ms. Orslini --

A.    Because if they don't ask questions --

Q.   Personally, correct?

A.   We -- they understand their own benefits.

Q.   So your medical practice that's been -- I mean I obviously see your advertisements and all that.  Very successful medical practice.  People come in to you either sick or want some body issues, but you don't go over it with them what their possible bill would be or you don't even go through with them whether they have an ability to pay it, you just take them in and then if you don't get the money you're gonna sue them?

MS. DE VOE:  Objection, argumentative, asked and answered multiple times and compound.

THE COURT:  What he's asking you is what's your procedure to ensuring that a new patient or any patient will pay?

MS. SPINA:  Okay.  So my answer is the same.  When a patient is new when they come to the desk when they first sign in if they have the littlest question to the biggest question we will most definitely address it.

Q.   But they have to ask the question, is that correct?

A.   If they have -- most people -- I can't even make an assumption.  Obviously if they understand their benefits and they know we do inform them we're out of network, if they say ooh, I don't understand, I wanna speak to somebody

most definitely we address it.

Q.   But they have to ask the question to you, correct?

A.   If they have a question they can ask.

Q.   Okay.

MR. BERGER:  I have no --

THE COURT:  How much -- hold it.  How much credit do you provide the average patient?

MS. SPINA:  What do you mean by credit?  Extending credit?

THE COURT:  Well, if somebody walks in that you've never met and says I want x surgery and I promise you I'll give you my insurance payments is there anything else you need to know?  Do you need to know whether they have a bank account, a house, a car, a dog, anything?

MS. SPINA:  No.

THE COURT:  Do you care?

MS. SPINA:  No, we don't, but what we do is if we're in network we know we're gonna be paid by the insurance, if we're out of network we have these documents that the patient can read and in some cases patients when we --

THE COURT:  Yeah, but the part of this whole thing that's confusing to me is they're out of network so I don't care about in network.  There's a promise to do something. You then perform services.

MS. SPINA:  That is correct.

THE COURT:  So you're extending credit to that person.

MS. SPINA:  Yes.

THE COURT:  You're performing a service and you're not getting paid today, you're extending credit, but --

MS. SPINA:  If they have signed these documents then, yes, if they don't wanna sign --

THE COURT:  But they sign the documents?

MS. SPINA:  Them we take the money upfront.

THE COURT:  How unusual is it for somebody not to pay you all or some portion of what you're owed?

MS. SPINA:  Of the checks received?

THE COURT:  I don't care about the checks received for the moment.  What percentage of your billings --

MS. SPINA:  I wouldn't know the percentage because this would only come into play with an out of network provider because in network sends --

THE COURT:  But you're only --

MS. SPINA:  The check to us.

THE COURT:  You're only out of network with this doctor?

MS. SPINA:  Yes.

THE COURT:  So how many -- in your experience at this place for fifteen years and in your role is it usual

for people not to pay?

MS. SPINA:  No.

THE COURT:  Is it unusual for people not to pay?

MS. SPINA:  Unusual.

THE COURT:  What does that mean?  What --

MS. SPINA:  There are cases where the patients keep the checks, there are patients where they don't - there are cases where they don't bring in what they're supposed to, but the majority do.

THE COURT:  What's the amount percentage wise of the minority, do you know?

MS. SPINA:  I wouldn't know the percentage.

THE COURT:  But it happens?

MS. SPINA:  It happens.

THE COURT:  So you're taking the risk that that person you're trusting will pay you?

MS. SPINA:  Yes, but in Ms. Orslini's case we never had any issue with her so she totally did understand the --

THE COURT:  I'm talking about from day one, you had no history day one.  Starting day one you have no history.

MS. SPINA:  No issue with her ever.

THE COURT:  Are there ever people that come into the practice in your experience that you just won't take on as a patient because of financial reasons, you don't expect you'll - they'll be straight and get paid?  Do you ever turn

people down for those reasons?

MS. SPINA:  I'm not aware of that, I don't think so.

THE COURT:  Okay.

MR. BERGER:  I have no further questions, Your Honor.

REDIRECT EXAMINATION

BY MS. DE VOE:

Q.   Just a few additional questions, Ms. Spina.  When Mr. Berger was questioning you he stated that if you would have received the insurance checks that's all you were interested in receiving.  Is there any other sums that Ms. Orslini was responsible for in addition to the insurance checks?

A.   Any deductible or co-insurance.

Q.   So when the insurance company issued a check to Ms. Orslini for $2,800 did they approve more than that for the procedures?

A.   Was there more -- there may have -- there was co-insurance and deductible would be.

Q.   So if the insurance company would have issued a check for $5,600 they would have reduced the check for co-insurance and deductible?

A.   Yes.

Q.   Are you aware of whether that happened in this

case?

A.    If those checks were reduced?

Q.    Correct.

A.    I know that the total amount due was $2,800.

Q.    That was the amount of the insurance checks?

A.    Yes.

Q.    Was a larger amount approved?

A.    Yes, there was a large amount approved.

Q.    Do you recall what that amount was?

A.    No, I don't.

Q.    Would it refresh your recollection if I showed you a document?

A.    Yes.

Q.    I'm hesitant to give you a calculator.  You referenced previously patient notes, do you recall that?

A.    Excuse me?

Q.    You referenced previously patient notes, do you recall that?

A.    Yes.

Q.    Okay.  I'm gonna show you a page from the patient notes for Lisa Orslini to refresh your recollection.  I don't want you to testify until I take the document back.

A.    So you want me to add all that up?

Q.    I want you look at the document and tell me if it refreshes your recollection as to the amount of --

A.    Yes, it does.

Q.    The deductible and/or co-insurance.  Can you take a moment to calculate it and then give me the document back?

A.    Is the last one I hit eight?

Q.    Eight.

A.    Thank you.  Okay.  So that's my mistake.  Okay.

Q.    Does this refresh your recollection as to the amount of the deductibles and co-insurance that the insurance company applied?

A.    Yes, it does.

Q.    And what was that number?

A.    $2,929.

Q.    So the insurance company reduced the check issued by that number?

A.    That is correct.

Q.    You also referenced patient notes during your cross examination by Mr. Berger.  Can you tell the Court what patient notes are?

A.    What patient, excuse me?

Q.    What patient notes are.

A.    What patient what?

Q.    Can you tell the Court what patient notes are?

A.    What patient was owed?

THE COURT:  What patient notes are.

MS. SPINA:  Oh, what patient notes are.  I'm so

sorry.

THE COURT:  It's okay.

A.    Okay.  So patient notes are what we put in in regards to what happened with the checks.

Q.    Can you explain what the patient note system is at LIM.

A.    The -- what the system is after that?

Q.    No, at LIM.

A.    At LIM, okay.  So we follow up with the payments, we then enter the notes in and then we send a statement to the patient according to that.

Q.    Do you make a notation in LIM'S patient note system every time an insurance company is contacted regarding a date of service?

A.    Yes, we do.

Q.    Do you make an entry into the patient note system every time a patient is contacted with regard to outstanding checks?

A.    Yes, we do.

Q.    Did you review the patient notes for Ms. Orslini prior to testifying today?

A.    Did I review them?

Q.    Correct.

A.    Yes.

Q.    Based upon your review of -- I'm sorry, strike

that.  Your testimony today is based upon a review of the patient notes regarding the different times Ms. Orslini was contacted regarding the checks, is that correct?

A.   That is correct.

Q.   Do you recall by reviewing the patient notes whether there was an issue with regard to Ms. Orslini's insurance policy and that was -- I'm sorry, strike that, that was a horrible question.  Do you recall whether there was an issue regarding Ms. Orslini's insurance and that's why there was a delay in payment by her insurance company?

A.   I don't recall any issue because we were receiving payments.

Q.   Do you recall there being an issue regarding a primary and a secondary insurance company?

A.   Yes, at one point I remember that there was a bit of an issue with that, but then we found out that this was her primary.

Q.   Were the services originally declined by Ms. Orslini's insurance company?

A.   Were there any services declined?

Q.   Were the services initially declined by Ms. Orslini's --

A.   Initially they were declined stating that she had a primary.

Q.   Did you have to appeal that decision?

A.   Yes, we did.

Q.   Did you continue to treat Ms. Orslini while you were appealing that decision?

A.   Yes, we did.

Q.   Did you eventually win that appeal?

A.   Yes, we did.

Q.   Do you recall approximately when that occurred?

A.   I don't recall the date.

Q.   Okay.  Would seeing the patient notes refresh your recollection as to when --

A.   Yes.

Q.   You received notification?  I'm showing you --

THE COURT:  Hold it.  You say you appealed?

MS. SPINA:  Well, I mean my department.

THE COURT:  No, no, while you're the practice appeal insurance --

MS. SPINA:  Because the insurance was stating that she had a different primary insurance.  You have to bill the primary first, but we knew that she didn't or we spoke with --

THE COURT:  But why do you care?

MS. SPINA:  Because we have to find out if there is a different primary.  Then we would need that information from the patient to bill them.

THE COURT:  If you're out of insur - if you're out

of network and you just want her to pay you -- I keep getting lost in this.  What's your -- why do you care what the insurance company does with her?

MS. SPINA:  No, it's not that - it's that if a patient has two insurances, a primary and a secondary  --

THE COURT:  You're not following me.  You're not looking whether she has insurance or not --

MS. SPINA:  No, we are.

THE COURT:  Why?  If you're out of network why?

MS. SPINA:  Because if she doesn't have insurance then she has to be a self-pay.  We do need proof that she has insurance.

THE COURT:  Why?  You're not seeking -- you're out of network.  You've already decided you're gonna treat her.  Why do you care if she's insured?

MS. SPINA:  We care because if she doesn't have insurance she would have to pay upfront so we have to have proof that she is - does have insurance in order to have her sign these documents agreeing to accept the  --

THE COURT:  But once the insurance company says no why don't you just go to the patient and say write me a check?

MS. SPINA:  No, we -- because protocol is that if the patient has a primary insurance you bill them first.  That is the protocol.  So we check with the patient, do you

have a new primary, that is the way that it works.

THE COURT:  I understand that's your protocol.  The problem I have with this whole thing is what I'm not getting is you guys go through a lot of effort to get the insurance company to issue checks to Ms. Orslini who you then claim took the checks, but you don't really care about those checks, you just wanna get paid.

MS. SPINA:  We wanna get paid the amount the insurance company paid the patient.

THE COURT:  No, that's not what you testified to I don't think.  If that is let me know.  I thought you wanna get paid what's owed you from some source and if it's not the insurance company you let the insurance - if it's not it's Ms. Orslini.  Isn't that why she owes you $54,000?

MS. SPINA:  No, because what we want are the insurance checks, co-insurance and deductible total.

THE COURT:  So if she handed you the $2,800 of checks she wouldn't owe you $54,000, that would --

MS. SPINA:  She would owe us the --

THE COURT:  Satisfy the whole bill?

MS. SPINA:  She would owe us the checks and the other portion that was applied to the co-insurance or deductible.

THE COURT:  What if that's considerably less than the services you performed?

MS. SPINA:  Excuse me?

THE COURT:  Help me out here.  You perform services.  I assume when the doctors are performing services there's not a big chart on a screen above their head which says this is a co-pay, stop cutting, this is something else, don't stitch her up.  You just perform services and they cost x dollars, right?

MS. SPINA:  We charge x dollars.

THE COURT:  You charge x dollars and that's I guess my question.  If you charge x dollars and you're not in network what's the difference between what you charge and what you get paid?

MS. SPINA:  Because if the patient has out of network benefits we agree with them as a courtesy to accept the payment plus deductible and co-insurance from their insurance company or if they're not going to use their insurance then they're self-pay and they have to pay upfront.

THE COURT:  I'm just thick.  I'm sorry, I got --

MS. DE VOE:  It's okay.

Q.   Ms. Spina, --

THE COURT:  I need to -- hold it.  No, I need to understand this.

MS. DE VOE:  I'm just trying to clarify.

THE COURT:  Okay.  Let me try to figure it out for

myself as difficult as that may be for me.  If you provided $50,000 worth of services and the insurance primary says that's worth $12,000 and they give Ms. Orslini $12,000 and she gives you $12,000 she's even with you?

MS. SPINA:  If there was no deductible and co-insurance she's even with us.

THE COURT:  So whatever the amount of the deductible plus what the insurance company allocates for that service is all you really charge the patient, the --

MS. SPINA:  And co- --

THE COURT:  Other number is just --

MS. SPINA:  And if there's --

THE COURT:  Fluff?

MS. SPINA:  Co-insurance, three elements.

THE COURT:  So there's no real correlation between the billing for the service and what full payment could actually be?

MS. SPINA:  We do review the benefits beforehand.

THE COURT:  So you send to the insurance company an invoice for your gross services, $100,000?

MS. SPINA:  That's correct.

THE COURT:  Insurance company says it's worth $7,100, Ms. Orslini had used up her deductible by then, there's no deductible left and they issue her a check for $7,100 which she dutifully turns over to you.  She's done,

she's even?

MS. SPINA:  That is correct.

THE COURT:  Okay.

Q.   Do different insurance companies pay different amounts?

A.   I'm sorry, what, Danny?

Q.   Do different insurance companies pay different amounts?

A.   They do.

Q.   Do some insurance companies pay the amount billed or pretty close?

A.   Pretty close, absolutely.

Q.   And are some insurance companies particularly cheap?

A.   Correct.

Q.   So the amount billed is the value of your services, but if they turn over the checks you'll accept what the insurance company pays?

A.   Correct.

Q.   You reviewed the patient notes prior to testifying today, correct?

A.   Excuse me?

Q.   You reviewed the patient notes prior to testifying today?

A.   Yes.

Q.    And you indicated that there was an appeal from her insurance company denying coverage, is that correct?

A.    Yes.

Q.    The appeal was subsequently won?

A.    Yes.

Q.    Do you recall approximately how long from the time the services were rendered until the appeal was decided that payment was remitted to Ms. Orslini?

A.    I don't remember the exact amount of time, but these things take a while.

Q.    Would you like me to show you the patient notes to --

A.    Sure.

Q.    Refresh your recollection?

MR. BERGER:  I just wanna object to the relevancy of this line of questioning.  I'm not sure where it's going. I mean I think the argument we've said is they accept the insurance or they don't accept the insurance payments.

MS. DE VOE:  Well, the relevancy goes to Judge Grossman's questioning my client (inaudible) payment and why they didn't just ask for her credit card and the answer is they were waiting for the appeal to be decided.  Until there's a final determination by the insurance company the client will wait for payment rather than charging the insurance --

THE COURT:  Look, I think if you're trying to establish that she didn't pay I know she didn't pay because there's a judgment against her.

MS. DE VOE:  Right, it's not what --

THE COURT:  And unless she was in a coma she did that intentionally, she didn't pay.  Whether that -- the elements of that non-payment meet 523 is the issue.  She didn't pay and she knows she didn't pay.

MS. DE VOE:  Correct, Your Honor.

THE COURT:  I don't think anybody can dispute that.

MS. DE VOE:  Right, and that's not the point we were making.  Your Honor questioned --

THE COURT:  Hold it.  You gotta go back so we can record you.

MS. DE VOE:  Sorry.

MR. BERGER:  They'll come and arrest you if you're not behind the shield, right?

MS. DE VOE:  Your Honor questioned and Mr. Berger questioned Ms. Spina ad nauseum about why it took them so long to - why they continued treating her and I'm trying to explain that to the Court that they had no reason to believe that she stole the checks because they had to go through this appeal and wait until the payment was made.  That was about a year process.  Both of you questioned my client on cross examination ad nauseum as to why they continued to

treat her to show that --

THE COURT:  Well, I asked her questions, I'm not sure it was ad nauseum, but go ahead.

MS. DE VOE:  But you questioned her about why it took so long for them to stop treating her and I know it goes to Mr. Berger's arguments in his pretrial memo that why would they continue to give her treatment if she hadn't turned over the checks and Ms. Spina is going to respond that they were waiting for the appeal to be decided.

THE COURT:  I understand that and I think they did what they do, they performed services, medical services and kept treating a patient.  I mean I understand that.  And I do understand that Ms. Orslini does owe you not less than $54,000 because that's the judgment and I will probably stipulate in my head right now she knows she didn't pay.

Now, the issue is that you've raised or Mr. Berger raised maybe she never got the checks blah, blah, blah.  Well, she has a bank account, you asked for those records, you didn't get them so, you know, I'll deal with that in my analysis of the case.  But the whole check insurance company is really a red herring because what you're trying to establish I think -- what I don't know is your client must send the insurance company an invoice for them to pay their insured.

They won't just write checks to insured.  They will

only send that invoice if the patient one way or another asks them to.  The signing of these documents which assigned the benefit of those checks to them was she merely a custodian.

You know, you've made out Rule C, whether there's a prima facie case the checks were issued.  If they're issued they've gotta establish what happened to them.  He doesn't want to, he doesn't want to.  I don't  -- it's his problem.  But assuming the checks were issued and she didn't turn them over, I'm just -- is your case that then the inference of not turning those checks over is applied to the rest of the judgment or establishes that a portion of the judgment is non-dischargeable?  It's a legal question.

MS. DE VOE:  It applies to the rest of the judgment because had she not signed these documents, had she not made these promises, had she not made these false representations they would have required upfront payment --

THE COURT:  Okay.

MS. DE VOE:  And we wouldn't be here today.

THE COURT:  Okay.

Q.    When an insurance company issues a payment for services who is that payment issued to for an out of network provider?

A.    Who is the person we billed first?

Q.    No.  When an insurance company issues payment for

services rendered whose name is written on the check in the pay to section?

A.    If it's an out of network provider the patient's name is written on the check.

Q.    Who was the policyholder in this case?

A.    Lisa Orslini, she signed saying she was the patient and the policyholder.

Q.    Based upon the fact that she was the policyholder who would the check have been issued payable to?

A.    Lisa Orslini.

Q.    Therefore, when the insurance company advised you the checks had been cashed who would have had to endorse those checks?

A.    Lisa Orslini.

MR. BERGER:  Objection, Your Honor, calls for speculation.  She indicated she has no personal knowledge of that.

MS. DE VOE:  Based upon the surrounding circumstances --

THE COURT:  I'll allow it, I'll allow it.

MS. DE VOE:  I have no further questions.

THE COURT:  Okay.

MS. SPINA:  I'm good?

THE COURT:  You're done.

MS. DE VOE:  Could you just give me one second to

put my file back together?

THE COURT:  Sure.

MR. BERGER:  Oh, thank you very much.

MS. DE VOE:  Your Honor, the plaintiff has no further witnesses to call.

THE COURT:  You rest?

MS. DE VOE:  I rest.

THE COURT:  Mr. Berger?

MR. BERGER:  Judge, at this point I move for a directed verdict and ask that this action be dismissed. There are three sections under the Code that they are seeking to try to object to dischargeability on, Section 523 (A)(2)(A) which they wanna show some type of false representation for an extension of credit or renewal of credit and it was obtained by false pretense, false representation or actual fraud.

The witness testified, Your Honor that they never asked for financials, they never asked for any type of documentation.

As a matter of fact, they never even asked for payment or a credit card.  They performed the services, Your Honor and, therefore, there's no justifiable reliance on any statements or documents that were made by the debtor that she could afford or make these payments.

As far as Section 523 (A)(6), Your Honor, willful

and malicious injury to a debtor or entity, they haven't been able to prove, Your Honor in their case any type of willful intent or deliberate or intentional injury.

Your Honor, whether it was willful or not under (A)(4), fraud or defalcation while acting as a fiduciary, Your Honor I don't believe they were able to show that any type of expressive trust existed, that the debt was caused by fraud or defalcation or any type of embezzlement of the checks, Your Honor.

They haven't been able to prove it, they haven't provided the checks,  Your Honor and based upon that, Your Honor I think this action should be dismissed.

MS. DE VOE:  Your Honor, the plaintiff respectfully submits that we have more than sufficiently set forth the prima facie case showing that this debt was procured by virtue of fraud, embezzlement, defalcation, larceny as well as willful and malicious injury.

As noted during our preliminary motions this Court's decision in re Girard is directly on point with this case, there are identical facts involving the same plaintiff.  When the exact same thing happened this Court found willful and malicious injury under 523 (A)(6) regarding these exact same sets and circumstances. Therefore, the plaintiff submits they've met the prima facie case.

The only reason why the checks weren't produced was because the defendant willfully, intentionally failed to comply with discovery and didn't produce the checks that we demanded.  They would be in her possession, custody or control.  Therefore, the plaintiff submits that we have set forth a prima facie case and the defendant's motion should be denied.

THE COURT:  Well, I'm gonna deny the motion.  Among other reasons the plaintiff is right, the plaintiff sought from you checks, bank statements that could have established certain elements that you believe are missing from the plaintiff's case.  That was your burden.  You failed to do that.  Can't introduce them now under the Court's orders so what the Court has is unless it can be shown otherwise these checks were issued in the name of Ms. Orslini and no other history.  So the inference is that she got them and cashed them.

Now, you're certainly free to put her on the stand and she can testify to other than that if that's what she wishes to do, but I think it is clear from the judgment, the default judgment that money is due and owed to the plaintiff, the failure to pay money is an injury to the plaintiff, there's no medical reason why Ms. Orslini couldn't have paid and that no longer is an issue before the Court.  She decided not to.

When she decided not to and whether those elements then satisfy 523 is the subject of what the Court has to decide.  But they have made a prima facie case here that funds were due and owing to the plaintiff and Ms. Orslini chose not to pay.

Now, if there are mitigating circumstances or circumstances that she wishes to testify to the Court under oath that's why we're on trial.  So I'll deny the motion and it's your case now.

MR. BERGER:  Thank you.  Your Honor, can we take five?

THE COURT:  Sure.  Talk --

MR. BERGER:  Okay.  Thank you.

THE CLERK:  Parties can step out.  You can take your personal things and leave everything else.

(Off the record at 11:42:33 a.m.)

(Recall began at 12:05:44 p.m.)

THE CLERK:  All rise.

THE COURT:  Be seated.  Mr. Berger?

MR. BERGER:  Your Honor, at this point the defendant doesn't have any witnesses to call.

THE COURT:  So you rest?

MR. BERGER:  We rest.

THE COURT:  Okay.  Any final statements?

MS. DE VOE:  Your Honor, I'd like to have posttrial

memos and we can conclude our statements, our closing statements in those memos.

THE COURT:  All right.  You both work out a timeframe to put in a posttrial to the extent you want to. The record now that it's closed is clear.  The issue will be not whether the defendant paid the money, she didn't, not whether she intentionally didn't pay the money, she intentionally didn't pay the money, the question is whether it fits with the elements of 2, 4 or 6.  That's what we're gonna have to review.

There's a question about is there a distinction for the Court between the checks which by implication and the defendant's failure to turn over any supporting documents the inference is she got them and didn't give them to you, didn't give them to the plaintiff.  That's $2,800.

Is that separate, is that an indication of the rest of the services?  I don't -- posttrial what I would focus on is not which one, not whether or not the funds are owed. She owed the money, she does owe you the $54,000.

And not really -- I guess the function is an interpretation of 523 and her actions both as established and what the Court can find by her failure to produce any number of documents that the plaintiff had requested because the Court clearly can't reach an adverse interest to that. In civil cases obviously we do that.

So while I wasn't prepared to strike her answer it's very common in this Court, my admonition or most of the time on these cases is if somebody doesn't wanna turn documents over try the case, but they can't introduce it at trial and there's a negative impact - inference to that.

Whether that inference is sufficient to cover the elements of 523 is a question for the Court with the full judgment.  The language of that judgment is that she owes the money, not that it was done in any particular fashion. And as we know, most debtors are here because they didn't pay somebody.

That's not a news flash.  And yet most debtors get discharged on their obligations.

So work out your timing, get us the posttrial briefs and we'll get you a decision relatively quickly on that.  Normally, -- Mr. Berger is probably more -- it takes at least - it takes about six months from today depending on quickly you guys get posttrial in for us.

If we're writing a decision it takes that, if it's just issuing -- this case doesn't appear to have anything that would require much of a written decision rather than just a judgment.  We'll see what issues are raised.  All right.  Thank you, all.  Have a good day.

MR. BERGER:  Thank you, Your Honor.

MS. DE VOE:  Thank you, Your Honor.

THE COURT:  Court's adjourned.

[Proceedings concluded]

C E R T I F I C A T E

I, Lynn O'Reilly, certify that the foregoing transcript is a true and accurate record of the proceedings.

Signature: *Lynn O'Reilly*

      ADL Transcription Services

      24 Crossway Drive

      Deer Park, New York 11729

      Date:  October 24, 2022

**< Dates >**
**1 8-21-14** 2:11
**12-19-18** 31:16
**2 8-21-14** 2:12
**2004  September 4th** 41:21
**8-21-2014** 22:23
**8-22-14** 2:14
**8-22-2014** 31:11
**August 21st, 2014** 25:22
**August 22nd, 2014** 40:7
**August 3rd, 2015** 46:1
**August, 2015** 42:14
**December 19th, 2018** 31:8
**November 9th, 2015** 46:1
**October 11, 2022** 1:7
**October 24, 2022** 83:15
**September 5th, 2014** 41:22
**September 6th** 41:22
**September, 2004** 41:21
**$10,000** 16:24
**$100,000** 70:20
**$12,000** 70:3, 70:4
**$15,000** 37:6, 41:25, 42:6
**$16,000** 29:25, 30:3
**$16,351** 46:2
**$17,175** 30:9
**$2,400** 8:23, 10:1, 29:3
**$2,800** 6:18, 7:11, 7:12, 7:13,
     7:16, 8:23, 29:3, 36:8,
     36:12, 37:22, 61:17, 62:4,
     68:17, 81:15
**$2,838.70** 39:5
**$2,880** 5:8
**$2,929** 63:12
**$20** 35:17
**$20,000** 33:8
**$24,000** 8:23
**$30** 35:17
**$36,000** 32:14, 32:20
**$36,975.69** 30:14
**$4,800** 40:9, 41:14, 41:15, 42:3
**$5,600** 61:22
**$50,000** 70:2
**$54,000** 6:21, 6:24, 7:10, 7:19,
     8:10, 10:6, 68:14, 68:18,
     74:14, 81:19
**$54,128.60** 33:6
**$60,000** 6:19
**$7,100** 70:23, 70:25
--------------------------------------

**-X** 1:3, 1:15
**-against-** 1:10


**< 1 >**
**1** 22:18, 23:17, 27:17, 54:24
**11** 2:4
**11530** 1:26
**11729** 1:40, 83:14
**11791** 1:31
**11:42:33** 80:16
**12-19** 31:11
**12-19-18** 2:14
**12:05:44** 80:17
**1325** 1:25, 3:6
**19-08085** 9:6


**< 2 >**
**2** 25:12, 25:14, 26:12, 27:18,
     81:9
**2006** 20:3
**2007** 12:7
**2014** 35:22, 38:9, 41:21, 41:22
**2015** 42:14
**2016** 28:25
**2017** 4:7
**2018** 31:11, 39:15
**2019** 35:23
**2021** 4:9, 12:3
**2022** 12:4
**21-08146** 1:4
**21-8146** 3:3
**210** 1:25, 3:7
**23** 2:11
**230** 1:30
**24** 1:39, 83:13
**26** 2:12
**277-7900** 1:41
**2A** 9:19


**< 3 >**
**3** 2:14, 29:14, 29:17, 29:18,
     30:19, 32:11, 39:24
**32** 2:14, 4:7
**34** 2:5


**< 4 >**

**4** 32:24, 81:9
**446** 4:9
**4A** 9:19


**< 5 >**
**523** 4:25, 6:25, 7:7, 7:9, 9:9,
     9:18, 73:7, 77:12, 77:25,
     78:22, 80:2, 81:21, 82:7
**550** 4:9
**576** 4:7


**< 6 >**
**6** 9:19, 81:9
**60** 4:9
**61** 2:6
**631** 1:41
**6901** 1:30
**[2]** 1:17
**[proceedings** 83:2


**< A >**
**A)(2)(A** 77:13
**A)(4** 78:5
**A)(6** 9:9, 77:25, 78:22
**a.m.** 80:16
**ability** 57:8
**able** 37:7, 49:11, 78:2, 78:6,
     78:10
**above** 24:5, 69:4
**Absolutely** 20:8, 23:14, 25:3,
     26:4, 27:16, 28:18, 32:8,
     34:22, 39:3, 71:12
**accept** 14:7, 34:16, 34:25,
     55:14, 67:19, 69:14, 71:17,
     72:17, 72:18
**accepted** 34:18
**access** 38:11
**according** 16:5, 64:11
**accordingly** 20:17
**account** 5:16, 48:5, 49:10,
     52:15, 52:19, 53:20, 53:21,
     54:2, 54:4, 58:14, 74:18
**accurate** 33:16, 83:7
**acting** 78:5
**action** 5:13, 77:10, 78:12
**actions** 81:21
**actual** 33:9, 36:14, 36:15,

77:16
**actually** 5:20, 10:13, 10:16,
     13:6, 24:3, 24:4, 24:8, 37:2,
     49:24, 70:17
**ad** 73:19, 73:25, 74:3
**add** 19:18, 29:21, 30:6, 30:7,
     62:23
**addition** 61:13
**additional** 32:17, 61:9
**address** 57:19, 58:1
**ADJ** 1:17
**adjourned** 83:1
**adjust** 19:7
**adjustment** 19:17, 19:21
**ADL** 1:38, 83:12
**admission** 21:14
**admitted** 23:17, 26:10, 32:10
**admonition** 82:2
**adversary** 5:4, 5:16, 7:15, 9:6,
     52:13, 52:23
**adverse** 81:24
**advertisements** 57:4
**advise** 23:20, 33:4
**advised** 76:11
**affidavit** 49:25, 50:7
**affidavits** 5:14
**affirm** 11:10
**afford** 77:24
**agree** 14:6, 24:23, 33:19,
     55:13, 69:14
**agreed** 8:24
**agreeing** 67:19
**Agreement** 2:13, 18:3, 24:13,
     24:15, 25:19, 25:21, 27:15
**ahead** 37:15, 47:9, 55:19, 74:3
**allegations** 54:12
**alleged** 4:11, 5:8, 5:11, 5:24
**alleging** 47:16
**allocates** 70:8
**allow** 38:25, 45:9, 76:20
**allowable** 14:7, 15:23, 16:5,
     16:25
**allowed** 41:10
**almost** 22:2
**already** 8:10, 8:24, 10:4, 21:13,
     42:2, 67:14
**Among** 79:8
**amounts** 71:5, 71:8
**an injury** 79:22
**analysis** 74:20

**and/or** 63:2
**answer** 4:21, 7:15, 29:10, 45:2, 46:23, 46:25, 47:1, 47:2, 47:8, 48:19, 48:20, 51:19, 51:24, 55:25, 57:16, 72:21, 82:1
**answered** 21:13, 55:22, 57:12
**answers** 51:22, 51:25
**anybody** 5:19, 37:18, 41:6, 44:5, 48:4, 73:10
**anyway** 10:20, 10:23
**apologize** 47:7, 49:19, 50:5
**appeal** 24:25, 65:25, 66:5, 66:16, 72:1, 72:4, 72:7, 72:22, 73:23, 74:9
**appealed** 66:13
**appealing** 66:3
**appear** 82:20
**appearance** 3:4
**APPEARANCES** 1:21, 1:33
**applied** 16:14, 37:4, 63:9, 68:22, 75:11
**applies** 75:14
**approach** 20:19, 50:4
**approve** 61:17
**approved** 62:7, 62:8
**approximately** 66:7, 72:6
**argue** 9:15, 55:16
**argued** 10:19
**argument** 72:17
**argumentative** 57:11
**arguments** 9:23, 74:6
**around** 19:15
**arrest** 73:16
**arrested** 10:13
**asks** 75:2
**assigned** 4:11, 75:2
**Assignment** 2:11, 18:2, 22:22, 54:24
**assume** 6:20, 10:8, 40:2, 51:14, 51:15, 51:18, 69:3
**assuming** 40:23, 75:9
**assumption** 52:2, 57:23
**attempted** 8:25
**attention** 9:5, 22:16, 25:10, 28:20, 29:6, 29:13, 32:23, 50:23
**attorney** 9:1, 33:11
**attorneys** 3:11, 53:10
**authorize** 24:4

**automatically** 40:2, 41:5
**Avenue** 1:25, 3:6
**average** 58:7
**aware** 7:24, 14:25, 15:15, 31:12, 33:7, 61:2, 61:25
**away** 7:12, 12:3, 38:10, 39:12

**< B >**
**back** 12:3, 18:19, 19:11, 20:16, 42:18, 50:15, 52:11, 54:23, 62:22, 63:3, 73:13, 77:1
**balance** 42:20
**balances** 40:2, 41:7
**band** 19:5, 19:7, 19:13, 19:15, 19:16, 19:22
**bank** 49:10, 52:15, 52:18, 58:13, 74:18, 79:10
**Bankruptcy** 1:1, 1:19, 4:7
**Bariatric** 11:23, 11:25, 12:6, 12:9, 12:13, 12:25, 13:9, 23:8, 23:12, 26:2, 26:6, 27:18, 32:2, 32:6
**Based** 3:22, 3:24, 4:10, 6:23, 14:15, 37:18, 41:10, 42:7, 43:12, 45:8, 46:15, 49:11, 64:25, 65:1, 76:8, 76:18, 78:11
**basically** 13:7
**basis** 4:24, 22:13
**become** 13:20
**becomes** 7:23, 49:3, 56:20
**beforehand** 50:18, 70:18
**began** 80:17
**beginning** 56:15
**behalf** 53:9
**behavior** 40:24
**behind** 73:17
**belief** 5:5
**believe** 13:6, 18:25, 19:5, 22:13, 22:14, 28:25, 29:3, 39:9, 39:15, 39:19, 40:18, 41:4, 44:6, 44:14, 44:18, 46:9, 47:21, 53:11, 73:21, 78:6, 79:11
**Benefit** 18:2, 24:25, 75:3
**Benefits** 2:11, 18:7, 22:22, 54:25, 57:2, 57:23, 69:14, 70:18
**better** 14:16, 16:16

**big** 69:4
**biggest** 57:18
**bill** 15:18, 39:15, 39:20, 40:5, 41:25, 45:19, 45:25, 46:17, 46:18, 57:7, 66:18, 66:24, 67:24, 68:20
**billed** 35:21, 35:24, 36:1, 36:3, 40:9, 46:2, 71:10, 71:16, 75:24
**Billing** 12:10, 12:14, 12:15, 12:16, 12:19, 55:21, 70:16
**billings** 59:15
**bills** 4:23, 39:24, 39:25
**binder** 22:18
**binding** 7:16, 8:6
**bit** 19:25, 65:15
**blah** 74:17
**Blue** 13:14, 25:7, 54:17
**body** 57:6
**book** 49:25
**bottom** 23:2
**Braff** 1:23, 3:6
**brand** 18:15
**Break** 56:6
**briefs** 82:15
**bring** 4:20, 9:4, 15:6, 20:17, 20:21, 20:23, 20:25, 22:1, 22:2, 28:13, 38:3, 60:8
**bringing** 22:9
**Brooklyn** 1:6
**brought** 20:7, 20:18, 20:21, 22:3, 38:5, 40:22, 43:13
**burden** 9:20, 79:12
**business** 11:23, 13:21, 23:8, 26:2, 26:6, 32:2, 32:6
**bypass** 19:1, 19:9, 20:3

**< C >**
**calculate** 63:3
**calculator** 30:2, 30:4, 30:13, 62:14
**call** 9:21, 11:4, 77:5, 80:21
**called** 17:7, 17:22, 18:2, 45:15
**Calls** 11:5, 22:14, 38:17, 38:20, 76:15
**Calm** 48:20
**candor** 8:25
**car** 58:14
**card** 41:2, 41:3, 42:8, 42:21,

43:16, 43:19, 44:1, 44:16, 72:21, 77:21
**care** 7:12, 8:9, 8:12, 10:8, 28:11, 28:17, 36:12, 36:17, 36:20, 43:16, 43:17, 43:20, 55:7, 58:16, 58:24, 59:14, 66:21, 67:2, 67:15, 67:16, 68:6
**case** 3:3, 3:23, 4:22, 7:9, 9:1, 10:25, 29:7, 33:15, 33:17, 33:19, 48:25, 51:8, 52:13, 52:23, 60:17, 62:1, 74:20, 75:6, 75:10, 76:5, 78:2, 78:15, 78:20, 78:25, 79:6, 79:12, 80:3, 80:9, 82:4, 82:20
**cases** 9:13, 19:10, 55:16, 58:20, 60:6, 60:8, 81:25, 82:3
**cash** 6:6, 28:14, 52:4, 52:6
**cashed** 3:21, 4:13, 5:6, 5:8, 5:15, 5:18, 7:21, 8:15, 51:5, 51:9, 51:10, 51:11, 51:13, 51:17, 52:4, 76:12, 79:16
**caused** 78:7
**certain** 18:5, 44:11, 79:11
**certainly** 56:17, 79:18
**certify** 83:6
**chair** 10:16, 10:21, 11:6
**change** 6:21, 32:20
**charge** 35:11, 55:24, 69:8, 69:9, 69:10, 69:11, 70:9
**charged** 27:1
**charges** 24:7, 24:10, 24:12, 24:17, 24:24, 33:11, 55:6
**charging** 72:24
**chart** 69:4
**cheap** 71:14
**checked** 21:23, 51:8
**checking** 53:20, 53:21, 54:2, 54:4
**chose** 80:5
**Circuit** 4:4
**circumstances** 9:9, 76:19, 78:23, 80:6, 80:7
**City** 1:26, 3:7
**civil** 81:25
**claim** 6:19, 68:5
**claims** 4:25
**clarify** 69:24

**clear** 17:13, 22:10, 30:13, 79:20, 81:5
**clearly** 20:23, 81:24
**CLERK** 3:2, 11:9, 11:15, 80:14, 80:18
**client** 6:24, 34:9, 39:17, 72:20, 72:24, 73:24, 74:22
**close** 71:11, 71:12
**closed** 81:5
**closing** 81:1
**co-** 70:10
**Co-insurance** 14:8, 16:15, 16:18, 16:19, 17:2, 17:3, 17:4, 20:9, 34:20, 34:21, 35:2, 35:10, 37:4, 61:15, 61:20, 61:23, 63:2, 63:8, 68:16, 68:22, 69:15, 70:6, 70:14
**co-pay** 34:12, 34:15, 34:21, 34:25, 35:1, 35:13, 35:15, 35:17, 69:5
**co-payment** 20:9, 34:19
**co-pays** 34:16, 34:20, 35:16
**Code** 77:11
**coding** 12:19
**collateral** 3:24, 4:2, 5:2, 6:23
**collected** 35:25
**collection** 12:21
**coma** 73:5
**comes** 12:18, 16:25, 42:19
**coming** 30:9, 41:7
**common** 82:2
**companies** 54:19, 54:21, 71:4, 71:7, 71:10, 71:13
**complaint** 5:4, 5:17, 52:13, 53:1, 53:5, 53:10, 54:11
**complete** 12:23
**completely** 12:23
**comply** 3:23, 79:3
**compound** 56:5, 57:12
**concern** 43:13
**conclude** 81:1
**concluded]** 83:2
**condition** 23:5, 25:24, 31:23
**Conference** 1:17
**confused** 34:6, 43:15
**confuses** 34:7
**confusing** 58:23
**considerably** 68:24
**contact** 22:11, 48:6

**contacted** 64:13, 64:17, 65:3
**continue** 22:5, 40:24, 43:10, 43:23, 44:8, 66:2, 74:7
**Continued** 1:34, 22:7, 40:20, 41:18, 42:10, 45:21, 46:13, 52:8, 73:20, 73:25
**continues** 54:11
**contract** 14:25, 15:24, 36:19, 46:18, 46:19, 46:20, 55:10, 55:12
**contracted** 14:6, 14:14, 14:23
**control** 19:12, 79:5
**conversation** 17:20, 45:11
**conversations** 7:4, 45:18
**convince** 10:5
**copies** 38:6, 38:7, 39:6, 39:8
**copy** 52:22
**correctly** 30:10
**correlation** 70:15
**cost** 27:1, 36:24, 37:10, 69:7
**costs** 24:10, 24:14, 24:19, 27:2
**Counsel** 4:20, 5:4, 6:5
**counts** 9:19
**couple** 4:19, 35:20, 54:22
**course** 5:9, 17:2, 23:7, 23:11, 26:1, 26:5, 32:1, 32:5, 52:17
**courtesy** 27:2, 69:14
**Courtroom** 28:5
**cover** 55:22, 82:6
**coverage** 72:2
**Covering** 2:14
**create** 23:8, 26:2, 32:2
**created** 25:24, 47:12
**credit** 41:2, 42:8, 42:21, 43:16, 43:18, 44:1, 44:16, 58:6, 58:8, 58:9, 59:2, 59:6, 72:21, 77:14, 77:15, 77:21
**creditor** 3:8, 7:1, 33:19
**Cross** 2:5, 13:14, 25:7, 34:4, 54:17, 56:8, 63:17, 73:25
**Crossway** 1:39, 83:13
**current** 12:25
**custodian** 75:4
**custody** 79:4
**cut** 47:6, 47:8
**cutting** 69:5

**< D >**
**D.** 50:7

**d/b/a** 1:7
**Daniel** 1:24, 3:5
**Danny** 71:6
**Date** 22:25, 23:5, 25:24, 30:21, 30:22, 30:24, 31:1, 31:3, 31:4, 31:6, 31:8, 31:12, 31:15, 40:14, 48:8, 64:14, 66:8, 83:15
**dated** 23:1, 25:20, 25:21, 30:16, 30:19
**dates** 36:2, 38:1, 38:2, 47:19, 48:6
**daughter** 18:14
**day** 12:20, 17:21, 22:9, 26:25, 31:23, 41:7, 56:15, 56:21, 60:19, 60:20, 82:23
**days** 17:19, 20:11, 26:22
**deal** 74:19
**debit** 41:2
**debt** 9:8, 9:11, 53:2, 78:7, 78:15
**debtor** 3:12, 3:13, 5:6, 5:15, 5:21, 9:17, 77:23, 78:1
**debtors** 9:18, 82:10, 82:12
**December** 35:23
**decide** 6:17, 80:3
**decided** 67:14, 72:7, 72:22, 74:9, 79:25, 80:1
**decision** 9:5, 9:24, 65:25, 66:3, 78:19, 82:15, 82:19, 82:21
**decisions** 6:9, 6:11, 7:4, 7:7
**declined** 65:18, 65:20, 65:21, 65:23
**deducted** 16:7, 16:11
**deductible** 14:8, 16:14, 16:17, 16:19, 16:20, 16:21, 16:24, 20:10, 26:24, 37:4, 37:6, 37:19, 61:15, 61:20, 61:23, 63:2, 68:16, 68:23, 69:15, 70:5, 70:8, 70:23, 70:24
**deductibles** 56:11, 63:8
**Deer** 1:40, 83:14
**defalcation** 78:5, 78:8, 78:16
**default** 4:2, 4:4, 4:23, 5:1, 5:4, 7:8, 50:1, 50:7, 79:21
**Defendant** 1:14, 1:28, 3:12, 3:13, 3:20, 4:11, 4:15, 6:14, 6:15, 6:24, 7:20, 9:21, 50:2, 50:7, 52:12, 52:22, 53:18,

53:25, 79:2, 79:6, 80:21, 81:6, 81:13
**defenses** 9:23
**definitely** 56:19, 56:20, 57:19, 58:1
**delay** 65:10
**delayed** 43:1
**deliberate** 78:3
**deliberately** 53:19, 54:1
**demanded** 79:4
**demands** 8:1
**denied** 4:21, 40:23, 79:7
**denies** 8:20
**deny** 79:8, 80:8
**denying** 72:2
**department** 66:14
**depending** 16:15, 17:1, 35:17, 82:17
**depends** 35:19, 55:15
**deposed** 50:12
**deposited** 5:15, 5:18, 49:9, 49:15, 53:19, 53:21, 54:1, 54:3, 54:8
**describe** 19:14
**DESCRIPTION** 2:9
**desk** 12:18, 17:21, 41:6, 45:15, 47:12, 57:17
**Despite** 51:2
**determination** 72:23
**determined** 34:23
**dictates** 7:17
**difference** 13:17, 69:11
**different** 14:12, 14:13, 14:14, 19:12, 34:15, 34:21, 35:3, 65:2, 66:18, 66:23, 71:4, 71:7
**differentiate** 49:11
**difficult** 70:1
**DIRECT** 2:4, 11:19, 22:16, 29:6, 50:23
**directed** 77:10
**directing** 25:10, 28:20, 29:13, 32:23
**directly** 14:11, 15:19, 15:21, 16:1, 26:19, 26:20, 38:13, 39:1, 39:3, 78:19
**disbursements** 27:2
**discharge** 4:23, 4:25, 9:17
**dischargeability** 4:6, 53:2, 77:12

**dischargeable** 7:3, 7:13, 9:8, 9:11, 10:6, 10:7
**discharged** 82:13
**discount** 27:2
**discovered** 22:6
**discovery** 3:23, 8:1, 79:3
**discuss** 3:18, 8:22
**dismissed** 77:10, 78:12
**dispute** 4:16, 5:7, 6:22, 73:10
**disputing** 3:20, 6:2, 6:20, 7:15, 8:7
**distinction** 81:11
**District** 1:2, 4:7
**doctor** 4:13, 10:23, 15:23, 16:1, 17:11, 17:14, 34:12, 34:14, 59:22
**doctors** 13:19, 13:23, 54:12, 54:16, 69:3
**documentation** 77:19
**documents** 8:18, 17:14, 17:16, 18:1, 18:4, 27:21, 27:23, 28:2, 28:6, 31:22, 58:19, 59:7, 59:9, 67:19, 75:2, 75:15, 77:23, 81:13, 81:23, 82:4
**dog** 58:14
**doing** 11:22, 13:7, 44:14
**dollar** 13:24
**dollars** 69:7, 69:8, 69:9, 69:10
**done** 7:18, 70:25, 76:24, 82:9
**down** 8:19, 36:23, 37:5, 48:20, 61:1
**Drive** 1:39, 83:13
**due** 8:25, 26:24, 62:4, 79:21, 80:4
**during** 20:22, 21:25, 63:16, 78:18
**duties** 12:15, 13:3
**dutifully** 70:25

**< E >**
**E.** 1:18
**early** 20:11
**Eastern** 1:2, 4:7
**eat** 19:23, 19:24, 19:25
**effect** 4:2, 4:5
**effort** 68:4
**Eight** 63:4, 63:5
**eighty** 17:5

**either** 9:21, 12:22, 16:8, 19:21, 28:13, 43:6, 43:7, 57:5
**electronic** 1:47, 33:15
**element** 8:19, 10:2
**elements** 7:7, 70:14, 73:7, 79:11, 80:1, 81:9, 82:7
**embezzled** 8:14, 8:16, 8:17
**embezzlement** 78:8, 78:16
**Empire** 13:14
**endorse** 51:3, 76:12
**endorsed** 26:21
**enormous** 7:23
**enough** 19:24
**ensuring** 57:14
**entails** 19:14
**enter** 64:10
**entered** 3:25, 6:20, 33:3, 36:19
**entire** 35:21
**entitled** 9:17
**entity** 78:1
**entry** 64:16
**establish** 7:7, 73:2, 74:22, 75:7
**established** 8:10, 79:10, 81:21
**establishes** 75:12
**estopped** 8:7
**estoppel** 3:24, 4:2, 5:2, 6:23
**Evans** 4:4, 6:1
**event** 10:9, 24:2, 24:14
**eventually** 66:5
**everything** 12:17, 36:6, 36:8, 80:15
**evidence** 4:16, 23:17, 26:10, 32:10
**evidentiary** 9:20
**exact** 9:7, 9:8, 72:9, 78:21, 78:23
**EXAMINATION** 2:4, 2:5, 2:6, 11:19, 34:4, 56:9, 61:7, 63:17, 73:25
**examined** 11:13
**example** 16:23, 17:5
**except** 10:12
**exception** 9:18
**Excuse** 14:2, 16:10, 19:16, 21:3, 26:20, 33:18, 33:23, 47:5, 51:23, 53:4, 56:3, 62:16, 63:19, 69:1, 71:22
**execute** 27:15

**executed** 23:5
**Exhibit** 22:18, 23:17, 25:12, 26:12, 27:17, 27:18, 29:14, 30:19, 32:11, 32:24, 39:14, 39:24, 47:23, 49:25, 50:2, 50:7, 52:12, 52:22, 54:24
**EXHIBITS** 2:8, 50:3
**existed** 78:7
**exists** 7:8
**expect** 46:21, 60:24
**experience** 22:2, 41:11, 59:24, 60:23
**explain** 13:16, 15:17, 17:14, 17:23, 56:17, 56:22, 64:5, 73:21
**explained** 56:23
**explains** 17:11
**explanation** 44:17, 44:22
**expressive** 78:7
**Extending** 58:8, 59:2, 59:6
**extension** 77:14
**extent** 81:4
**extra** 55:24

**< F >**
**facie** 75:6, 78:15, 78:24, 79:6, 80:3
**fact** 4:10, 6:3, 45:24, 76:8, 77:20
**facts** 4:17, 49:25, 78:20
**fail** 26:23
**failed** 79:2, 79:12
**fails** 24:2
**failure** 3:23, 79:22, 81:13, 81:22
**Falco** 6:2
**false** 75:16, 77:13, 77:15
**familiar** 18:9, 18:12, 50:10, 52:23
**far** 77:25
**fashion** 82:9
**featured** 11:8
**Federal** 4:1
**fee** 14:16, 55:12
**fees** 9:2, 24:14, 24:20, 27:1, 33:11
**few** 3:17, 7:3, 13:5, 19:4, 19:10, 20:16, 22:1, 22:4, 29:19, 30:25, 40:18, 61:9

**fiduciary** 78:5
**fifteen** 59:25
**fighting** 10:7
**figure** 9:13, 22:4, 69:25
**file** 42:9, 77:1
**filed** 33:17, 38:10, 39:12, 53:7
**filing** 33:15
**fills** 19:6
**final** 40:3, 40:4, 72:23, 80:24
**financial** 60:24
**financials** 77:18
**find** 7:22, 52:5, 66:22, 81:22
**finding** 6:25
**fine** 29:22, 49:21
**Finish** 12:11, 27:10, 46:24, 47:1, 47:2, 47:3, 47:9, 51:20, 51:22, 51:24, 51:25
**finished** 18:18
**First** 4:20, 12:5, 12:8, 12:12, 16:14, 16:24, 17:21, 18:13, 20:2, 20:16, 22:6, 36:1, 49:20, 55:19, 56:8, 56:14, 56:15, 56:20, 57:17, 66:19, 67:24, 75:24
**Fischoff** 1:28, 3:11
**fit** 10:21
**fits** 81:9
**five** 80:11
**flash** 82:12
**Fluff** 70:13
**fluid** 19:18, 19:22, 19:24
**focus** 81:17
**follow** 35:8, 43:23, 49:3, 64:9
**following** 67:6
**follows** 11:13
**foregoing** 83:6
**foremost** 4:20
**forever** 18:17
**form** 56:2, 56:4
**format** 30:12
**forth** 32:20, 33:24, 78:14, 79:6
**forward** 26:23, 51:3, 56:16
**forwarded** 26:21
**found** 6:24, 8:5, 9:7, 10:4, 65:16, 78:22
**fourteen** 12:1
**Franklin** 1:25, 3:6
**fraud** 8:13, 10:2, 77:16, 78:5, 78:8, 78:16
**free** 79:18

**front** 6:22, 7:2, 8:18, 12:18, 17:21, 41:6, 45:15, 47:12, 47:25
**full** 5:9, 16:3, 26:25, 70:16, 82:7
**function** 81:20
**funds** 80:4, 81:18

**< G >**
**gain** 19:11
**Garber** 13:10, 13:11, 13:13, 23:25, 25:4, 35:2, 54:21
**Garden** 1:26, 3:7
**gastric** 19:13, 20:3
**general** 44:21
**Gerard** 9:6
**getting** 12:20, 44:13, 47:14, 59:6, 67:2, 68:3
**Girard** 78:19
**give** 4:2, 5:2, 6:18, 6:19, 18:7, 23:22, 27:23, 35:17, 43:7, 58:12, 62:14, 63:3, 70:3, 74:7, 76:25, 81:14, 81:15
**given** 17:15, 18:4, 38:13, 52:3
**gives** 70:4
**God** 11:11
**gonna** 5:21, 6:5, 6:15, 6:16, 8:19, 27:25, 36:24, 37:7, 49:17, 49:22, 50:23, 50:25, 52:11, 52:21, 53:14, 53:17, 55:21, 55:22, 56:10, 57:10, 58:18, 62:20, 67:14, 79:8, 81:10
**gotta** 73:13, 75:7
**granted** 27:3
**gross** 70:20
**Grossman** 1:18, 28:5, 72:20
**Group** 11:23, 11:25, 12:6, 12:13, 13:1, 13:9, 23:8, 23:12, 26:2, 26:6, 27:18, 32:2, 32:6
**grow** 13:21
**guess** 29:5, 29:10, 34:7, 35:22, 51:18, 69:9, 81:20
**guest** 10:14, 10:20
**guys** 10:7, 10:24, 68:4, 82:18

**< H >**

**hand** 7:11, 11:9, 30:22, 31:19, 33:9
**handed** 68:17
**hands** 8:1
**happened** 39:10, 48:13, 51:7, 52:6, 61:25, 64:4, 75:7, 78:21
**happens** 12:17, 24:2, 60:13, 60:14
**head** 13:9, 69:4, 74:15
**hear** 30:17
**Hearsay** 21:8, 21:10, 21:12
**heart** 44:15
**Heath** 1:29, 3:10
**held** 24:8, 26:25, 55:16
**Help** 11:11, 52:24, 53:5, 55:17, 69:2
**hence** 19:22
**hereby** 24:4
**herein** 11:12
**herring** 74:21
**herself** 6:16, 52:6
**Hershey** 4:8
**hesitant** 62:14
**high** 36:3
**higher** 14:15
**hire** 15:2
**hires** 15:14
**history** 60:20, 79:16
**hit** 63:4
**Hold** 21:11, 43:3, 58:6, 66:13, 69:22, 73:13
**holding** 9:11
**honestly** 6:17
**HONORABLE** 1:18
**horrible** 65:8
**house** 58:14
**housekeeping** 3:18
**hundred** 17:8
**hypothetically** 38:21

**< I >**
**identical** 78:20
**identification** 22:17, 23:16, 25:11, 26:11, 29:14, 32:11, 32:24
**impact** 82:5
**implication** 81:12
**importantly** 5:3

**in.** 20:7, 20:25, 22:2, 34:25
**Inaudible** 10:8, 10:18, 35:16, 41:13, 50:5, 55:23, 72:20
**Inc.** 1:38
**inclusive** 4:5
**incurred** 10:1, 24:7, 55:6
**INDEX** 2:1
**indicated** 25:4, 37:21, 39:14, 72:1, 76:16
**indicates** 50:12
**indication** 81:16
**individual** 4:3, 48:10, 49:9
**inference** 75:10, 79:16, 81:14, 82:5, 82:6
**inflatable** 19:16
**inform** 52:5, 57:24
**information** 5:5, 47:25, 52:18, 53:12, 66:23
**informed** 21:22, 41:6
**initial** 18:20
**Initially** 18:23, 18:25, 65:21, 65:23
**inject** 19:22
**injury** 78:1, 78:3, 78:17, 78:22
**inside** 19:16, 19:22
**installed** 10:15
**insur** 66:25
**insurances** 67:5
**insured** 67:15, 74:24, 74:25
**intended** 8:14
**intent** 8:13, 78:3
**intentional** 78:3
**intentionally** 53:18, 54:1, 73:6, 79:2, 81:7, 81:8
**interest** 5:10, 21:15, 81:24
**interested** 61:12
**interests** 4:12, 15:7, 23:24
**interim** 6:4
**internal** 49:11
**interpretation** 81:21
**introduce** 79:13, 82:4
**invalid** 30:12
**Invasive** 1:6, 3:2, 11:22
**investigation** 48:2
**invoice** 31:1, 31:3, 31:4, 31:7, 31:8, 31:12, 39:18, 70:20, 74:23, 75:1
**Invoices** 2:14, 29:6, 29:19, 29:22, 30:6, 32:15, 32:21
**involved** 14:20, 47:16

**involving** 78:20
**irrelevant** 10:1, 10:4, 36:16
**Island** 1:6, 3:2, 11:22
**issue** 3:21, 5:10, 7:2, 7:10, 7:13, 7:25, 10:6, 20:10, 43:21, 45:2, 56:19, 56:20, 60:18, 60:21, 65:6, 65:9, 65:11, 65:13, 65:16, 68:5, 70:24, 73:7, 74:16, 79:24, 81:5
**issued** 14:9, 14:10, 16:8, 16:12, 16:22, 48:8, 51:5, 56:17, 61:16, 61:21, 63:13, 75:6, 75:9, 75:22, 76:9, 79:15
**issues** 4:20, 6:23, 20:4, 20:14, 57:6, 75:21, 75:25, 82:22
**issuing** 82:20

**< J >**
**J-a-c-q-u-e-l-i-n-e** 11:17
**Jackie** 47:4
**Jacqueline** 1:34, 2:3, 3:8, 11:5, 11:17
**Jericho** 1:30
**job** 12:15, 13:3, 46:12
**Judge** 1:19, 4:8, 5:7, 28:5, 33:18, 49:17, 72:19, 77:9
**Judges** 7:5, 7:6
**judgment** 3:25, 4:4, 4:24, 5:1, 5:4, 5:9, 6:20, 33:3, 33:5, 33:7, 33:14, 33:16, 33:24, 50:1, 50:8, 73:3, 74:14, 75:12, 75:14, 79:20, 79:21, 82:8, 82:22
**judgments** 4:2, 7:4
**judicial** 4:16, 9:10, 33:13
**June** 12:3
**justifiable** 77:22

**< K >**
**keep** 46:16, 60:6, 67:1
**kept** 22:6, 28:17, 74:12
**kind** 19:15, 35:16
**kinda** 35:17
**knowing** 4:13
**knowledge** 4:17, 38:23, 45:10, 46:10, 48:9, 51:2,

54:9, 76:16
**knows** 38:19, 73:8, 74:15
**Koblenz** 1:23, 3:6

**< L >**
**laid** 5:1
**language** 82:8
**lap** 19:5
**laparoscopic** 18:25, 19:5, 19:8
**larceny** 78:16
**large** 62:8
**larger** 62:7
**last** 39:18, 63:4
**later** 19:4
**law** 4:1, 4:5, 51:15
**lawyers** 7:5, 7:6, 10:19
**lay** 9:23
**least** 82:17
**leave** 80:15
**left** 30:22, 70:24
**legal** 27:1, 27:2, 75:13
**less** 16:16, 16:17, 68:24, 74:13
**lesser** 13:5
**liability** 37:11, 37:18, 56:10
**liable** 36:24
**Light** 22:22
**LIM** 64:6, 64:8, 64:9
**LIM'S** 64:12
**limine** 3:19, 7:11
**limiting** 19:23
**line** 12:23, 72:16
**Lisa** 1:12, 1:33, 3:12, 3:13, 18:9, 18:14, 18:16, 62:21, 76:6, 76:10, 76:14
**listed** 24:5
**Listen** 6:8
**litany** 42:14
**litigation** 28:22, 29:2, 29:24, 32:18
**little** 19:25, 34:6
**littlest** 57:18
**loathed** 7:6
**local** 10:19
**logical** 6:14
**Long** 1:6, 3:2, 11:22, 11:24, 13:11, 18:17, 28:14, 72:6, 73:20, 74:5
**longer** 79:24

**Look** 8:22, 9:14, 25:12, 29:15, 29:20, 40:6, 49:20, 50:15, 62:24, 73:1
**looked** 22:3
**looking** 30:15, 30:18, 56:18, 67:7
**looks** 40:6
**Lord** 4:8
**lost** 21:18, 49:10, 67:2
**lot** 48:25, 68:4
**loud** 50:25
**love** 10:12
**lower** 3:25
**Lynn** 4:7, 83:6

**< M >**
**ma'am** 25:15, 46:16
**main** 10:8
**mainly** 9:23
**maintain** 26:6, 32:6
**maintained** 38:8
**majority** 60:9
**malicious** 78:1, 78:17, 78:22
**maliciously** 53:19, 54:1
**managed** 12:16
**manager** 12:10, 12:14, 12:15, 13:2, 13:3
**MARKED** 2:9, 22:17, 23:16, 25:11, 26:11, 29:14, 30:18, 32:10, 32:23, 39:23, 40:4, 49:24, 50:6, 52:11, 52:21, 54:23
**Matter** 1:4, 5:25, 29:2, 29:24, 45:24, 46:14, 77:20
**matters** 3:18
**max.** 17:7
**mean** 5:19, 35:24, 44:21, 57:3, 58:8, 60:5, 66:14, 72:17, 74:12
**meaning** 16:17
**means** 17:4, 21:14
**medical** 4:23, 13:20, 24:5, 24:6, 51:4, 55:6, 57:3, 57:5, 74:11, 79:23
**medicine** 13:11
**meet** 73:7
**memo** 74:6
**memos** 81:1, 81:2
**mentioned** 17:24

**merely** 75:3
**met** 58:11, 78:24
**middle** 27:7, 30:23
**Miller** 6:2
**mine** 6:9
**Minimally** 1:6, 3:2, 11:22
**minority** 60:11
**minus** 14:8
**mischaracterization** 39:17
**missing** 20:24, 21:1, 21:4, 22:4, 79:11
**mistake** 63:6
**mitigating** 80:6
**moment** 29:20, 59:15, 63:3
**money** 7:1, 8:14, 8:24, 9:15, 9:16, 16:7, 16:11, 24:9, 35:5, 52:7, 52:9, 57:9, 59:10, 79:21, 79:22, 81:6, 81:7, 81:8, 81:19, 82:9
**month** 40:2, 41:5
**months** 82:17
**morning** 3:5, 3:9, 3:10, 3:14, 3:15, 11:21
**motion** 3:19, 4:21, 6:4, 79:6, 79:8, 80:8
**motions** 78:18
**move** 10:10, 10:13, 26:10, 32:10, 77:9
**multiple** 57:12
**myself** 70:1

**< N >**
**name** 11:16, 18:1, 18:13, 18:14, 18:16, 18:17, 76:1, 76:4, 79:15
**named** 18:9
**Nancy** 4:8
**nauseum** 73:19, 73:25, 74:3
**necessary** 7:7
**need** 8:6, 19:19, 25:3, 27:16, 29:21, 30:13, 49:20, 58:13, 66:23, 67:11, 69:22
**negative** 82:5
**Neither** 29:9
**nervous** 30:11
**New** 1:2, 1:40, 3:7, 4:1, 4:5, 4:7, 11:23, 11:24, 12:5, 12:9, 12:12, 12:25, 13:9, 18:15, 23:7, 23:11, 26:1, 26:5,

32:1, 32:5, 33:15, 57:14, 57:17, 68:1, 83:14
**news** 82:12
**next** 25:22, 29:21, 41:18, 42:13, 53:25
**No.** 38:7, 58:15, 60:2, 75:25
**non-dischargeable** 5:10, 75:13
**non-payment** 73:7
**none** 4:25
**Normally** 9:13, 9:18, 13:19, 13:22, 14:15, 15:22, 16:3, 82:16
**notation** 64:12
**note** 64:5, 64:12, 64:16
**noted** 78:18
**notes** 47:21, 47:22, 62:15, 62:17, 62:21, 63:16, 63:18, 63:20, 63:22, 63:24, 63:25, 64:3, 64:10, 64:20, 65:2, 65:5, 66:9, 71:20, 71:23, 72:11
**nothing** 11:11
**Notice** 1:17, 9:10, 33:13
**notification** 66:12
**November** 42:14
**number** 3:3, 9:6, 22:18, 53:15, 63:11, 63:14, 70:11, 81:23
**numbers** 29:9, 52:16, 52:19
**numerous** 40:3
**NY** 1:6, 1:26, 1:31

**< O >**
**O'reilly** 83:6
**oath** 51:16, 80:8
**object** 33:20, 53:1, 72:15, 77:12
**Objection** 21:8, 21:12, 23:18, 23:19, 26:13, 26:14, 28:7, 29:11, 32:12, 32:13, 33:21, 37:12, 37:13, 38:15, 39:16, 46:24, 48:17, 51:20, 54:14, 56:2, 56:4, 57:11, 76:15
**obligation** 15:12, 46:17
**obligations** 15:10, 24:15, 82:13
**obtained** 33:14, 77:15
**Obviously** 54:10, 57:4, 57:23, 81:25

occur 17:20
occurred 66:7
October 12:7
offering 4:15
office 26:21, 40:17
Once 17:7, 67:20
One 3:22, 10:14, 12:2, 17:8, 20:20, 22:9, 29:9, 29:25, 39:9, 40:3, 40:5, 43:1, 43:3, 46:5, 52:14, 56:21, 60:19, 60:20, 63:4, 65:15, 75:1, 76:25, 81:18
ones 38:3, 40:3
online 48:25
ooh 57:25
open 22:18
Opening 10:24, 11:1, 11:2
opens 19:25
opponent 21:14
order 67:18
orders 79:13
ordinary 23:7, 23:11, 26:1, 26:5, 32:1, 32:5
originally 65:18
otherwise 27:24, 79:14
Ottimo 4:4, 6:2, 6:9
outcome 24:25
outstanding 29:1, 29:23, 32:15, 32:21, 32:22, 33:8, 33:25, 34:1, 38:4, 39:24, 40:1, 41:1, 41:7, 42:20, 48:6, 64:17
Overruled 21:16, 37:15, 54:15
overt 23:24
owe 68:18, 68:19, 68:21, 74:13, 81:19
owed 7:10, 9:1, 41:15, 42:3, 59:12, 63:23, 68:12, 79:21, 81:18, 81:19
owes 6:24, 7:1, 7:19, 8:10, 8:24, 9:15, 9:16, 10:4, 10:5, 41:13, 68:14, 82:8
owing 80:4
own 57:2


< P >
p-i-n-a 11:18
p.m. 80:17
PAGE 2:2, 25:21, 25:22, 27:7,

41:19, 42:13, 53:15, 62:20
paid 13:23, 16:21, 17:7, 24:8, 28:12, 28:16, 36:11, 37:3, 38:1, 38:3, 43:5, 46:21, 58:18, 59:6, 60:25, 68:7, 68:8, 68:9, 68:12, 69:12, 79:24, 81:6
paperwork 12:19
paragraph 24:23, 50:24, 53:15, 53:25
paragraphs 5:17
Park 1:40, 83:14
part 19:16, 58:22
participates 13:13
particular 14:7, 17:16, 82:9
particularly 71:13
Parties 80:14
partitions 10:11
parts 38:2
party 21:14
path 8:19
patients 17:15, 18:5, 18:6, 19:11, 20:20, 22:8, 26:17, 34:16, 44:12, 58:20, 60:6, 60:7
payable 76:9
paying 44:4
Payment 2:13, 12:21, 12:22, 14:1, 14:18, 15:16, 15:19, 15:20, 16:22, 17:1, 18:3, 25:18, 27:19, 28:3, 35:6, 36:17, 36:20, 41:1, 41:5, 41:15, 42:9, 42:21, 44:9, 45:12, 46:8, 46:9, 49:2, 55:20, 65:10, 69:15, 70:16, 72:8, 72:20, 72:24, 73:23, 75:17, 75:21, 75:22, 75:25, 77:21
payments 14:3, 26:18, 26:20, 37:7, 40:1, 56:16, 58:12, 64:9, 65:12, 72:18, 77:24
pays 28:1, 43:16, 71:18
pennies 13:24
People 36:22, 57:5, 57:22, 60:1, 60:3, 60:22, 61:1
percent 17:5, 17:6, 17:9
percentage 59:15, 59:16, 60:10, 60:12
perform 43:11, 46:20, 58:25, 69:2, 69:6

performed 42:5, 42:11, 68:25, 74:11, 77:21
performing 49:5, 59:5, 69:3
perhaps 22:9
period 26:25, 31:20, 31:21
perjure 6:16
person 16:15, 48:5, 59:3, 60:16, 75:24
personal 5:16, 5:18, 38:23, 46:10, 48:9, 53:20, 53:21, 54:2, 54:8, 76:16, 80:15
Personally 33:14, 38:7, 44:23, 45:10, 45:17, 46:12, 47:11, 53:23, 54:3, 56:21, 57:1
phone 22:14
physically 47:13, 49:8
place 59:25
placed 29:24
placement 19:5, 19:6
Plaintiff 1:9, 1:23, 1:35, 3:7, 3:19, 6:15, 9:7, 11:4, 22:17, 23:16, 23:17, 25:11, 26:10, 26:11, 27:17, 27:18, 29:14, 32:11, 32:24, 51:3, 51:5, 52:12, 52:22, 54:24, 77:4, 78:13, 78:21, 78:24, 79:5, 79:9, 79:12, 79:22, 79:23, 80:4, 81:15, 81:23
PLAINTIFF'S 2:9
plan 24:25, 55:20
play 59:17
Please 3:3, 11:9, 11:15, 12:11, 13:16, 15:4, 22:18, 22:20, 23:20, 25:12, 25:17, 26:15, 27:10, 29:9, 29:15, 33:2, 43:23, 46:24, 51:19, 51:21
PLLC 3:6
plus 5:10, 9:1, 27:1, 33:11, 69:15, 70:8
pocket 16:16, 16:22, 16:25, 17:7, 17:8, 28:14, 37:6, 37:19, 43:7, 55:7, 56:12
point 5:19, 14:15, 36:7, 37:1, 37:21, 39:9, 41:15, 43:4, 44:2, 44:11, 44:24, 65:15, 73:11, 77:9, 78:19, 80:20
policy 16:15, 16:16, 16:18, 27:19, 37:17, 65:7
policyholder 27:12, 76:5, 76:7, 76:8

portion 59:12, 68:22, 75:12
portions 20:11
position 7:20
possession 79:4
possible 38:12, 57:7
posttrial 80:25, 81:4, 81:17, 82:14, 82:18
practice 13:12, 17:10, 18:19, 18:24, 19:3, 19:9, 20:2, 20:6, 20:12, 20:16, 22:24, 23:12, 24:5, 24:6, 37:10, 40:13, 54:12, 54:17, 57:3, 57:5, 60:23, 66:15
practicing 13:11
Pre-trial 1:17
precedent 4:1, 6:1, 6:7, 7:16, 8:6, 9:10
precluded 3:20, 4:15, 6:2
preclusion 3:24
preliminary 78:18
premised 3:24
prepared 82:1
pretense 77:15
pretrial 74:6
Pretty 13:5, 18:18, 71:11, 71:12
previous 41:11
previously 25:11, 26:11, 33:19, 62:15, 62:17
prima 75:6, 78:15, 78:24, 79:6, 80:3
primary 65:14, 65:17, 65:24, 66:18, 66:19, 66:23, 67:5, 67:24, 68:1, 70:2
printed 41:8
prior 20:22, 41:7, 64:21, 71:20, 71:23
probably 39:11, 74:14, 82:16
problem 7:23, 20:13, 20:24, 21:24, 22:8, 22:10, 68:3, 75:8
problems 20:8
procedure 19:12, 19:13, 20:3, 35:8, 35:22, 36:24, 57:14
procedures 19:2, 19:9, 61:18
proceeding 4:6, 7:15, 9:6, 52:23
Proceedings 1:47, 4:11, 83:7
process 12:16, 73:24
procured 78:15
produce 8:6, 79:3, 81:22

**produced** 1:49, 79:1
**profession** 38:18
**promise** 58:11, 58:24
**promises** 75:16
**proof** 5:12, 5:14, 8:19, 10:3, 27:23, 67:11, 67:18
**protocol** 67:23, 67:25, 68:2
**prove** 7:8, 8:17, 9:20, 10:2, 78:2, 78:10
**proves** 6:25
**provide** 5:11, 25:1, 45:21, 46:13, 53:12, 58:7
**provided** 5:13, 46:1, 70:1, 78:11
**provider** 13:14, 13:17, 13:18, 14:1, 14:4, 14:5, 14:10, 14:12, 14:14, 14:18, 14:20, 15:2, 15:8, 15:14, 15:16, 15:18, 15:25, 16:6, 16:8, 17:17, 18:1, 24:6, 25:2, 25:5, 27:15, 34:17, 34:24, 35:4, 35:14, 39:3, 48:14, 48:24, 48:25, 55:6, 59:18, 75:23, 76:3
**providers** 13:19, 13:21, 13:22
**providing** 40:20
**provision** 24:13
**provisions** 24:1
**public** 33:14
**Pursuant** 39:23, 42:2
**put** 7:6, 10:16, 19:15, 50:21, 50:23, 53:14, 64:3, 77:1, 79:18, 81:4

**< Q >**
**question** 12:11, 21:13, 27:10, 29:21, 39:5, 39:21, 39:22, 40:5, 41:13, 45:17, 46:23, 47:15, 48:3, 48:15, 48:19, 48:21, 51:19, 51:21, 54:7, 56:2, 56:4, 56:13, 57:18, 57:19, 57:20, 58:2, 58:3, 65:8, 69:10, 75:13, 81:8, 81:11, 82:7
**questioned** 73:12, 73:18, 73:19, 73:24, 74:4
**questioning** 61:10, 72:16, 72:20
**questions** 12:18, 17:22, 34:3,

35:20, 54:23, 56:21, 56:25, 61:5, 61:9, 74:2, 76:21
**quick** 54:22
**quickly** 82:15, 82:18
**quite** 36:3

**< R >**
**raise** 11:9
**raised** 74:16, 74:17, 82:22
**rates** 14:14
**rather** 6:15, 72:24, 82:21
**Re** 1:4, 4:8, 6:1, 9:5, 78:19
**reach** 17:6, 81:24
**read** 7:8, 9:13, 50:25, 53:17, 58:20
**reading** 31:18
**real** 54:22, 70:15
**realize** 6:11, 43:2
**Really** 36:2, 36:12, 36:20, 68:6, 70:9, 74:21, 81:20
**reason** 40:21, 41:11, 43:1, 43:13, 44:14, 73:21, 79:1, 79:23
**reasonable** 43:24, 44:12
**reasons** 3:22, 60:24, 61:1, 79:9
**REC'D** 2:10
**Recall** 18:20, 18:23, 19:2, 28:24, 29:1, 29:6, 62:9, 62:15, 62:18, 65:5, 65:8, 65:11, 65:13, 66:7, 66:8, 72:6, 80:17
**receipt** 17:19, 26:22
**receive** 15:5, 17:10, 21:5, 21:6, 26:23, 27:24, 36:4, 39:4, 43:22, 45:3, 49:4
**received** 3:20, 17:18, 18:21, 18:24, 20:5, 20:7, 22:14, 23:24, 33:10, 36:6, 36:8, 36:13, 37:22, 37:25, 40:3, 47:17, 47:20, 47:24, 48:4, 48:10, 49:9, 51:3, 55:1, 55:2, 59:13, 59:14, 61:11, 66:12
**receiving** 14:3, 21:25, 61:12, 65:11
**recently** 4:8
**recognize** 25:13, 32:25
**recollection** 29:23, 62:11,

62:21, 62:25, 63:7, 66:10, 72:14
**record** 9:20, 11:16, 31:17, 33:14, 33:16, 73:14, 80:16, 81:5, 83:7
**recorded** 1:47
**recording** 1:47
**records** 49:12, 74:18
**Recovery** 22:23
**red** 74:21
**REDIRECT** 2:6, 61:7
**reduced** 61:22, 62:2, 63:13
**reduction** 55:13, 55:15
**referenced** 62:15, 62:17, 63:16
**referencing** 22:25
**referred** 28:22, 29:2, 32:18
**reflected** 32:15
**Refresh** 29:22, 62:11, 62:21, 63:7, 66:9, 72:14
**refreshes** 62:25
**refuses** 27:17
**REG** 1:4
**regard** 9:5, 9:7, 14:3, 15:1, 19:13, 20:9, 27:19, 64:17, 65:6
**regarding** 15:16, 64:14, 65:2, 65:3, 65:9, 65:13, 78:23
**regardless** 24:25
**regards** 16:12, 22:14, 64:4
**regular** 22:13, 23:7, 23:11, 26:1, 26:5, 32:1, 32:5
**reimburse** 15:23
**reimbursed** 16:1, 16:4
**relations** 13:2, 13:4
**relationship** 15:9, 15:15
**relatively** 82:15
**Relevance** 37:12, 37:14, 54:14
**relevancy** 72:15, 72:19
**reliance** 77:22
**remain** 24:24, 32:21, 33:24, 38:4
**remember** 9:12, 18:13, 18:15, 29:4, 45:20, 65:15, 72:9
**remembered** 18:16
**remitted** 72:8
**remitting** 14:1
**rendered** 4:3, 4:5, 31:6, 40:7, 51:4, 72:7, 76:1
**renewal** 77:14

**rephrase** 15:13
**represent** 6:18
**representation** 77:14, 77:16
**representations** 75:16
**reputation** 40:22, 42:7, 43:12, 45:8, 46:15, 46:16
**requested** 4:14, 81:23
**require** 82:21
**required** 75:17
**research** 48:12, 48:16, 48:23
**resolve** 43:21
**resolved** 12:24, 45:2
**respectfully** 4:14, 78:13
**respond** 8:2, 21:2, 74:8
**response** 42:22
**responsibility** 14:17, 15:1, 15:5, 49:3, 51:2, 52:5, 54:6
**responsible** 17:6, 24:8, 24:10, 24:12, 24:14, 24:17, 24:19, 26:25, 33:10, 55:16, 61:13
**responsibly** 56:18
**rest** 75:11, 75:14, 77:6, 77:7, 80:22, 80:23, 81:16
**retain** 4:14, 23:12
**retired** 12:2
**return** 19:9
**returned** 19:4, 22:24
**review** 37:8, 37:10, 50:18, 53:9, 64:20, 64:22, 64:25, 65:1, 70:18, 81:10
**reviewed** 71:20, 71:23
**reviewing** 65:5
**rid** 10:15
**rights** 4:12, 15:7, 23:24
**rise** 80:18
**risk** 60:15
**ROBERT** 1:18
**role** 59:25
**rubber** 19:16
**Ruby** 4:6
**Rule** 75:5

**< S >**
**S.** 1:29
**Sahn** 1:23, 3:6
**Sam** 11:18
**Satisfy** 68:20, 80:2
**saying** 18:15, 25:14, 30:12, 42:24, 43:22, 52:2, 76:6

**says** 5:6, 7:19, 24:16, 42:21, 44:16, 46:20, 55:5, 58:11, 67:20, 69:5, 70:2, 70:22
**schedule** 14:16
**school** 13:20
**screen** 69:4
**seasoned** 13:22
**seat** 11:8
**seated** 11:15, 80:19
**Second** 4:3, 4:22, 24:23, 25:22, 27:7, 42:18, 52:14, 76:25
**secondary** 65:14, 67:5
**Section** 76:2, 77:12, 77:25
**sections** 77:11
**seeing** 17:11, 17:25, 25:2, 27:14, 34:16, 35:14, 66:9
**seeking** 4:23, 4:25, 5:9, 53:1, 67:13, 77:12
**seen** 5:19, 41:10
**sees** 15:25
**self-pay** 28:1, 67:11, 69:17
**send** 15:20, 39:15, 64:10, 70:19, 74:23, 75:1
**sends** 15:19, 28:4, 59:18
**sense** 42:19
**sent** 14:16, 14:19, 14:21, 21:23, 22:13, 31:1, 31:12, 31:23, 39:18, 39:20, 39:25, 42:25, 49:2
**separate** 56:19, 56:20, 81:16
**series** 9:22, 9:23
**served** 8:1
**service** 1:49, 12:23, 14:8, 36:2, 38:2, 55:12, 59:5, 64:14, 70:9, 70:16
**Services** 1:38, 18:20, 18:23, 31:6, 34:9, 34:13, 40:7, 40:20, 40:23, 41:18, 42:5, 42:11, 42:14, 43:11, 45:21, 45:25, 46:14, 46:20, 48:6, 49:5, 51:4, 52:8, 55:9, 58:25, 65:18, 65:20, 65:21, 68:25, 69:3, 69:6, 70:2, 70:20, 71:17, 72:7, 74:11, 75:22, 76:1, 77:21, 81:17, 83:12
**set** 32:20, 33:24, 78:14, 79:5
**sets** 78:23
**settle** 9:1

**settlements** 9:3
**seven** 17:19, 26:21, 26:25, 38:10, 39:11
**shared** 52:20
**Shawn** 13:10
**she'd** 24:12, 24:19
**She'll** 7:19, 7:21
**Shield** 13:14, 25:7, 73:17
**show** 49:18, 52:21, 62:20, 72:11, 74:1, 77:13, 78:6
**showed** 46:7, 54:5, 54:10, 62:11
**showing** 50:6, 66:12, 78:15
**shown** 79:14
**shows** 8:11, 41:19
**Shumer** 1:28, 3:11
**sick** 57:6
**side** 30:22, 31:19
**sign** 12:19, 14:17, 15:6, 17:16, 18:8, 23:23, 26:18, 27:8, 27:11, 27:17, 27:21, 28:2, 28:6, 57:18, 59:8, 59:9, 67:19
**Signature** 27:6, 50:15, 83:10
**signed** 22:23, 27:4, 27:9, 59:7, 75:15, 76:6
**signing** 23:23, 75:2
**signs** 17:24
**similar** 13:8
**simply** 34:25
**sit** 36:23, 37:5, 37:17, 56:9
**sitting** 28:5, 45:17
**situation** 20:22, 20:23
**six** 50:24, 53:15, 82:17
**sixty** 8:23
**sixty-nine** 13:6
**sleep** 41:19
**small** 7:23
**Smallwood** 4:9, 6:1
**smart** 9:14
**somebody** 28:16, 46:17, 57:25, 58:10, 59:11, 82:3, 82:11
**someone** 15:25, 19:8, 25:1
**someplace** 39:12
**Sometimes** 34:6, 42:25
**somewhat** 6:13
**Sorry** 18:22, 19:17, 28:21, 29:3, 30:1, 30:9, 30:14, 30:17, 48:22, 49:24, 64:1,

64:25, 65:7, 69:19, 71:6, 73:15
**sought** 34:9, 79:9
**sound** 1:47
**source** 68:12
**specific** 9:10, 55:3
**Specifically** 4:3, 5:15, 5:24
**speculation** 38:17, 38:20, 76:16
**spell** 11:15
**spoke** 21:1, 21:3, 66:19
**staff** 12:16, 12:17
**stand** 6:5, 6:15, 9:22, 11:5, 11:7, 79:18
**standard** 37:10
**start** 12:5, 19:11, 20:14, 36:1
**started** 12:8, 12:12, 55:20, 56:8
**Starting** 60:20
**starts** 17:1
**State** 3:3, 5:13, 5:15, 6:21, 6:23, 7:3, 7:5, 7:6, 10:5, 11:15, 24:19, 33:15
**stated** 31:10, 33:18, 61:10
**Statement** 21:15, 23:2, 31:19, 31:20, 31:21, 36:9, 40:4, 41:5, 53:17, 54:7, 64:10
**statements** 5:5, 5:6, 10:25, 11:1, 18:8, 22:13, 40:1, 77:23, 79:10, 80:24, 81:1, 81:2
**STATES** 1:1, 1:19, 15:1, 24:3, 24:4, 24:13, 26:18
**stating** 8:4, 17:16, 17:18, 17:25, 21:5, 21:14, 23:23, 45:3, 45:4, 49:1, 65:23, 66:17
**statutory** 4:24
**stay** 12:2
**step** 42:18, 80:14
**stipulate** 74:15
**stitch** 69:6
**stole** 5:25, 6:3, 7:16, 73:22
**stomach** 19:15
**stood** 18:16
**stop** 69:5, 74:5
**straight** 60:25
**strike** 4:21, 28:21, 64:25, 65:7, 82:1
**studies** 41:19

**subject** 80:2
**submits** 78:14, 78:24, 79:5
**subpoenaed** 8:5
**subsequently** 72:4
**substance** 23:21, 26:16
**substantial** 45:25
**substantially** 23:4, 25:23, 31:22
**substantiate** 49:15
**successful** 57:5
**sue** 57:10
**sufficient** 82:6
**sufficiently** 78:14
**suing** 8:23
**Suite** 1:25, 1:30, 3:7
**sum** 23:21, 26:16
**Summons** 1:17
**sums** 24:7, 61:12
**supporting** 81:13
**supposed** 36:6, 47:12, 60:8
**Surgery** 1:7, 3:3, 11:22, 27:1, 28:1, 58:11
**surrounding** 76:18
**Sustained** 28:8
**swear** 11:10, 50:20
**swore** 51:16
**sworn** 50:12
**Syosset** 1:31
**system** 33:15, 64:5, 64:7, 64:13, 64:16

**< T >**
**testified** 11:13, 39:18, 51:6, 56:8, 68:10, 77:17
**testify** 5:21, 5:22, 6:17, 7:22, 11:6, 62:22, 79:19, 80:7
**testifying** 29:11, 45:18, 55:23, 64:21, 71:20, 71:23
**testimony** 8:21, 34:8, 34:18, 39:17, 42:2, 65:1
**that'll** 8:21
**theory** 38:12
**there'd** 25:3
**thereafter** 4:13
**They'll** 9:23, 60:25, 73:16
**They've** 5:11, 5:13, 17:7, 75:7, 78:24
**thick** 69:19
**thinking** 22:3

**third** 45:25
**thirteen** 5:17
**Thirty** 13:12
**Thirty-six** 30:14
**though** 7:25
**three** 4:25, 41:19, 70:14, 77:11
**throughout** 54:11
**tied** 8:1
**tighter** 19:23
**till** 12:23, 35:22
**timeframe** 81:4
**timespan** 21:25
**timing** 82:14
**title** 12:8, 12:12, 12:25
**Today** 4:15, 7:12, 9:14, 23:5, 25:24, 28:6, 31:23, 32:21, 33:25, 45:18, 59:6, 64:21, 65:1, 71:21, 71:24, 75:19, 82:17
**together** 77:1
**took** 8:15, 68:6, 73:19, 74:5
**top** 10:16
**total** 24:12, 24:17, 27:20, 28:2, 29:25, 33:10, 36:5, 62:4, 68:16
**totally** 60:18
**Tpke** 1:30
**train** 21:18
**Transcriber** 1:38
**transcript** 1:49, 33:13, 33:16, 83:6
**Transcription** 1:38, 1:49, 83:12
**treat** 22:5, 22:7, 66:2, 67:14, 74:1
**treating** 73:20, 74:5, 74:12
**treatment** 74:7
**Trial** 1:17, 3:2, 9:14, 80:8, 82:5
**tried** 10:16
**true** 7:22, 33:16, 48:10, 83:7
**trust** 78:7
**trusting** 60:16
**truth** 11:10, 11:11, 50:20
**try** 6:13, 10:13, 39:12, 69:25, 77:12, 82:4
**trying** 29:22, 44:19, 47:11, 69:24, 73:1, 73:20, 74:21
**turn** 14:17, 17:18, 20:20, 24:2, 24:9, 27:24, 32:17, 53:15, 60:25, 71:17, 75:9, 81:13,

82:3
**turned** 24:11, 24:17, 44:17, 55:2, 55:3, 74:8
**turning** 15:7, 20:4, 20:11, 20:15, 75:11
**turns** 70:25
**twenty** 17:6
**twenty-seven** 53:15
**twice** 27:9, 27:11
**two** 3:22, 25:21, 31:10, 67:5
**type** 77:13, 77:18, 78:2, 78:7, 78:8
**typical** 19:8

**< U >**
**ultimate** 37:18
**Um-hmm** 55:11
**unable** 19:24, 39:13
**underlying** 4:10, 5:25
**understand** 6:10, 17:17, 17:25, 23:23, 53:8, 57:2, 57:23, 57:25, 60:18, 68:2, 69:23, 74:10, 74:12, 74:13
**UNITED** 1:1, 1:19
**Unless** 9:18, 45:15, 52:20, 54:5, 54:10, 73:5, 79:14
**Unlike** 4:1
**unpaid** 24:24
**Until** 17:6, 24:11, 28:1, 28:3, 36:7, 39:15, 43:21, 44:11, 49:23, 62:22, 72:7, 72:22, 73:23
**Unusual** 59:11, 60:3, 60:4
**upfront** 15:22, 16:3, 27:20, 28:2, 35:5, 35:9, 59:10, 67:17, 69:18, 75:17
**upheld** 4:6
**upper** 31:19
**using** 46:16
**usual** 59:25

**< V >**
**v.** 4:4, 6:1
**value** 71:16
**various** 46:4
**verbally** 17:13
**verdict** 77:10
**versus** 3:3, 6:2

**via** 41:2
**virtue** 78:16
**visit** 46:5
**visits** 20:17, 46:4
**voracity** 50:20

**< W >**
**wait** 28:3, 52:10, 55:23, 72:24, 73:23
**waiting** 72:22, 74:9
**waive** 11:2
**waived** 11:1
**walk** 7:12
**walks** 58:10
**wanna** 8:17, 8:20, 9:3, 9:4, 10:2, 10:3, 10:24, 13:23, 19:12, 28:12, 40:6, 43:3, 57:25, 59:8, 68:7, 68:8, 68:11, 72:15, 77:13, 82:3
**wants** 7:20, 11:6
**Ward** 1:23, 3:6
**water** 19:19
**weight** 19:11
**welfare** 24:25
**Westlaw** 4:9
**whatever** 7:8, 7:19, 9:19, 42:25, 45:4, 70:7
**Whether** 7:2, 7:10, 7:11, 9:15, 9:16, 9:17, 10:2, 13:6, 16:12, 17:11, 19:2, 41:2, 43:16, 47:13, 48:9, 49:8, 49:10, 51:16, 54:3, 57:8, 58:13, 61:25, 65:6, 65:8, 67:7, 73:6, 75:5, 78:4, 80:1, 81:6, 81:7, 81:8, 81:18, 82:6
**whole** 11:10, 42:13, 58:22, 68:3, 68:20, 74:20
**will** 5:22, 9:21, 9:22, 17:4, 17:5, 17:8, 17:18, 19:24, 24:6, 24:8, 26:19, 26:20, 26:25, 27:24, 48:7, 57:14, 57:19, 60:16, 72:24, 74:14, 74:25, 81:5
**willful** 3:23, 77:25, 78:3, 78:4, 78:17, 78:22
**willfully** 53:18, 53:25, 79:2
**willing** 28:3
**win** 66:5
**wise** 60:10

**wish** 39:3, 47:3, 47:9
**wishes** 7:20, 79:20, 80:7
**withdraw** 48:3
**within** 17:19, 26:21, 26:24
**Without** 23:19, 26:14, 32:13, 33:21, 44:9
**Witness** 1:35, 11:7, 11:12, 29:12, 50:4, 77:17
**WITNESSES** 2:2, 77:5, 80:21
**won** 72:4
**word** 46:16
**words** 31:20
**work** 11:21, 13:25, 14:3, 43:21, 44:19, 81:3, 82:14
**worked** 11:24, 12:1
**working** 12:5, 12:8, 12:12, 44:12, 48:5
**works** 6:10, 68:1
**worried** 41:12
**worth** 8:22, 70:2, 70:3, 70:22
**write** 67:21, 74:25
**writing** 82:19
**written** 17:14, 76:1, 76:4, 82:21
**wrote** 9:13

**< Y >**
**year** 12:2, 73:24
**years** 12:1, 13:12, 19:4, 19:10, 20:6, 38:10, 39:11, 43:13, 59:25
**York** 1:2, 1:40, 3:7, 4:1, 4:5, 4:7, 11:23, 11:24, 12:5, 12:9, 12:12, 12:25, 13:9, 23:8, 23:12, 26:1, 26:6, 32:2, 32:6, 33:15, 83:14